Florence S. Hyman, Plaintiff, *v.* Walter E. Sachs et al., Individually and as Copartners Doing Business under the Name of Goldman, Sachs & Co., et al., Defendants.

Supreme Court, Trial Term, New York County, November 23, 1948.

*Paskus, Gordon & Hyman* for plaintiff.

*Robert L. Augenblick* and *Herman W. Gruning* for Walter E. Sachs and others, as copartners doing business under the name of Goldman, Sachs & Co., and another, defendants.

*Leo J. Rosett* for Nicholas J. Gerold and others, individually and as copartners doing business under the name of Josephthal & Co., defendants.

STEUER, J. Plaintiff, in this transaction, acted through her husband, an attorney, and it is not disputed that his acts and information are attributable to her. The defendants are two brokerage concerns who act for customers and deal themselves in various securities. These concerns will be hereinafter referred to by the first names in their titles, respectively Josephthal and Goldman. In January, 1941, plaintiff gave defendant Josephthal an order to buy ten Series A 4½% income bonds of the Chicago, Milwaukee, St. Paul and Pacific Railroad. At that time there were no such bonds. The railroad was then in reorganization and the bonds intended and so understood by all parties were the bonds provided for in a plan of reorganization, which plan was then in litigation. It was further understood that plaintiff was to receive the bonds when and if they were issued by the railroad. Josephthal immediately placed an order with Goldman, who agreed to deliver such bonds when and if they were issued for a price of $338.75 per bond and Josephthal confirmed the transaction to plaintiff.

Nothing happened between these parties until August, 1944, when Josephthal notified plaintiff that the National Association of Securities Dealers, Inc. (generally and hereinafter referred to as N. A. S. D.), had ruled that all contracts for the delivery of these bonds be cancelled, and in accord with that ruling no delivery would be made to the plaintiff. Plaintiff promptly refused to accede to this disposition and made demand for delivery and then, learning of Josephthal's contract with Goldman, made similar demand on them.

The situation which prompted the N. A. S. D. ruling grew out of the history of the litigation involving the reorganization plan. This plan had been approved by the United States Dis-

trict Court (*Matter of Chicago, Milwaukee, St. Paul & Pacific R. R. Co.*, 36 F. Supp. 193), but this determination was reversed by the Circuit Court of Appeals (124 F. 2d 754). The United States Supreme Court then heard an appeal from the reversal. In the meantime five years had elapsed. The effect of the determination of the Supreme Court (*sub nom. Group of Institutional Investors* v. *Chicago, Milwaukee, St. Paul & Pacific R. R. Co.*, 318 U. S. 523) was that the original plan was approved as far as these bonds were concerned and in most other particulars, except that the plan was to be as of the then date instead of the date of the plan's original promulgation, and the Interstate Commerce Commission was directed to submit a plan carrying this direction into effect. It appeared that the railroad during the five-year period had enjoyed large profits. By moving forward the effective date of the plan, these profits redounded to the credit of the creditors and the holders of the old securities of the railroad rather than to the credit of the holders of the securities provided for in the plan of reorganization. In the new plan bonds of the same kind and duration were provided for, but as there was a five-year interval between the plans, the maturity dates of the bonds under the revised plan were five years later than that originally provided for.

The suit poses two questions: Is the resolution of the N. A. S. D. binding on the plaintiff, and, if not, is the contract capable of performance? The latter question depends on whether the bonds issued pursuant to the plan as corrected are the bonds that are called for under the contract.

As to the first question, a person who instructs a broker to carry out a certain transaction which would necessarily, or even ordinarily, involve its being carried out on a certain exchange, is bound by the rules of that exchange (*Ford* v. *Snook*, 205 App. Div. 194, affd. 240 N. Y. 624). But we do not have that situation here. The N. A. S. D. was not an exchange. Plaintiff was not even aware of its existence, and it is not so widely known that she could be held chargeable with such knowledge. There is nothing to show that she contemplated or even ought, in the usual course, to have suspected that her order would entail compliance with the rules of any such body. As being chargeable with such knowledge is the basis of binding a customer to the rules of an exchange, the absolute lack of it prevents any such consequence.

But it is claimed that this result was reached by agreement of the parties. The confirmation slip sent the plaintiff by Josephthal contained the legend: " Transactions in unlisted

securities are subject to the usages and customs among dealers in such securities ''. It may be safely concluded from the circumstances that this legend was sufficiently brought to the attention of the plaintiff to constitute a term of her agreement with her broker. The '' usage and custom '' claimed by the defendants is that all transactions were subject to the regulations of the N. A. S. D. This is neither a usage nor a custom. It is the result of an agreement among certain of those brokers, entered into for their own protection and that of the public. No practice which is the result of a course of dealing or conduct is sought to be enforced but the rules of a supervisory body. As a matter of fact the legend could not have meant exactly what defendants contend because when the legend was composed and for some time thereafter, the N. A. S. D. had promulgated no rules at all. It follows that plaintiff is not bound by the ruling of the N. A. S. D. and if the bonds bought have been issued, she is entitled to them or damages for their nondelivery.

Were such bonds ever issued? It is admitted that bonds as exactly described in the contract were never issued. But the description of the securities is not controlling (*Weller* v. *Tuthill,* 66 N. Y. 347; *Markowitz* v. *Mayer,* 232 App. Div. 68). As regards a bond, the name is not significant. What matters is the obligor, the security, the rate of interest and the term. Of these, the obligor and the rate of interest were the same under the bonds to be issued under both plans. The term of both was seventy-five years, but the issue date and hence the due date differed by five years. And the security differed in the respect that interest was only payable if earned, and the old plan bonds, if they had been issued in 1944 (when the new plan was adopted), would have had an accumulation of five years' interest, whereas the new bonds would have no such accumulation and in the period 2014 to 2019, the five years which replaced the years 1939–1944, the road might or might not earn the interest. These are not inconsequential differences. It is true that these differences make the new bonds inferior investments to the bonds earlier provided for and that the plaintiff waived the differences at the earliest possible opportunity. But it is not a question if the plaintiff is willing to accept the substituted securities — it is whether she could be compelled to accept them. She could not. That being so, she cannot compel performance. Judgment for defendants.