**Philip S. SIRIANNI, Petitioner,**

v.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**
Respondent.

No. 80–7586.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 11, 1982.

Decided May 24, 1982.

Joseph G. Riemer, III, Brown, Wood, Ivey, Mitchell & Petty, New York City, for petitioner.

Michael J. Stewart, S.E.C., Washington, D. C., argued, for respondent; Jacob H. Stillman, Securities & Exchange Comm., Washington, D. C., on brief.

Before MERRILL, KENNEDY and CANBY, Circuit Judges.

MERRILL, Circuit Judge:

Petitioner Sirianni seeks review of a decision and order of the Securities and Exchange Commission (SEC) affirming disciplinary action taken against him by the National Association of Securities Dealers, Inc. (NASD).

NASD is a national securities association registered with SEC under Section 15A of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78o–3(a). It is composed of firms who sell securities in the over-the-counter market. The Exchange Act requires NASD to regulate the conduct of its members by promulgation of rules designed to protect investors and to promote just and equitable principles of trade. 15 U.S.C. § 78o–3(b)(6). NASD has adopted such rules and enforces them through imposition of disciplinary sanctions. Disciplinary actions by NASD are subject to review by SEC. 15 U.S.C. § 78s(e).

NASD after investigation charged that petitioner had violated Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, in that he had as an underwriter participated in the sale of securities without complying with the registration requirement of that act. Further, it charged that petitioner had violated Article III, Section 1 of the NASD Rules of Fair Practice, NASD Manual (CCH) ¶ 2151, by failing to notify his employer of this participation.

Following a hearing before a subcommittee of NASD's Business Conduct Committee for District No. 2, the Committee ruled on behalf of NASD that petitioner was guilty of the violations charged. He was fined $25,000 and barred from association with any NASD member in any capacity. The holding was upheld by the Board of Governors of NASD but the fine was increased to $50,000 and the association bar was reduced to suspension from association for one year. On review by SEC the Board's order was affirmed and this proceeding was initiated by petitioner to secure judicial review.

Petitioner is employed by Connecticut General Life Insurance Company (CG) where his activities have dealt largely with the estate and tax planning areas of the life insurance business. He is registered with NASD as a representative of CG Equity Sales Company (CGE), a wholly owned subsidiary of CG and member of NASD which engages in the sales of mutual funds. Petitioner has gained a reputation among his insurance clients as a knowledgeable and successful investor on his own behalf in properties providing tax shelters.

In 1976, petitioner was approached by Howard Gatliff who had a contract with an

affiliate of Cal-Am Corporation to sell limited partnership interests in enterprises holding coal mining leases. Cal-Am and its affiliated companies were general partners in the enterprises.[1] The most important aspect of the partnerships from an investment point of view was the promise of a significant tax write-off of 322% for each dollar invested. Gatliff solicited petitioner's purchase of limited partnership interests. Petitioner investigated the investment and was advised by counsel that unless the Internal Revenue Service was satisfied that the partnership had a bona fide intent to mine coal, the anticipated tax benefit might be challenged. Accordingly, as a condition to his investment, petitioner insisted upon a rider to the partnership agreement granting the limited partners the right to remove the general partner if coal were not mined within a reasonable period of time. Petitioner subsequently invested over $500,000 in Cal-Am limited partnerships under agreements having the required rider.

Gatliff also arranged for petitioner to receive a fee of 15% of the amount of any investment for anyone referred by him to Gatliff who should become an investor in a limited partnership. Petitioner thereafter made several referrals to Gatliff and received a total of $253,000 in finder's fees.

## I

The Commission found that petitioner had as an underwriter participated in the sale of unregistered securities in violation of Section 5 of the Securities Act. The question before us is whether this finding is supported by substantial evidence. 15 U.S.C. § 78y(a)(4); *Sartain v. SEC*, 601 F.2d 1366, 1372 (9th Cir. 1979).

1. The limited partnerships in question were part of an integrated offering sold by Cal-Am and others to about 3000 investors. Approximately 300 separate partnerships were established all of which had the similar purpose of acquiring and operating coal mining leases. Total sales approximated $30,000,000.

2. The registration requirement of Section 5, 15 U.S.C. § 77e, does not apply to "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1). The Government argues that finding petitioner an

The Securities Act defines "underwriter" as:

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking * * *.

15 U.S.C. § 77b(11). Petitioner contends that his simple referrals to Gatliff did not bring him within the terms of this definition, and accordingly that he was not subject to the Section 5 registration requirement.[2] We conclude that substantial evidence supports the Commission's finding that by making his referrals to Gatliff in the manner in which he did, petitioner had a "direct or indirect participation" in Gatliff's sales to the persons whom he had referred.

Petitioner first contends that the fact that he received a finder's fee standing alone cannot constitute him an underwriter. He relies on *In re South Umpqua Mining Co.*, 3 S.E.C. 233, 241 (1938), where the Commission held that one who receives a fee cannot be found an underwriter without some showing that he participated in the distribution of an issue. Disregarding for the moment that more than the receipt of a fee has been shown here, we note that the cited case is distinguishable from the one before us. While there the fee was paid by the underwriter for referral of the issuer to it, here petitioner received fees for referral to the underwriter of securities *purchasers*. His fees thus related directly to the sale of the Cal-Am securities.[3]

underwriter was not a necessary precondition to Section 5 liability, but we need not reach this question.

3. The NASD Board of Governors stated in its decision, "The generally accepted definition of a 'finder' is a person who introduces a prospective issuer to an underwriter, and in our view would not include a person who on a continuing basis receives a fee for placing retail customers in touch with the issuer or the issuer's representative."

Petitioner also argues that his referrals to Gatliff did not constitute significant participation in the sale of securities. He points to our holding in *SEC v. Murphy*, 626 F.2d 633, 648 (9th Cir. 1980), that one's participation in the sale of unregistered securities "must be a significant one before liability will attach." On examination, we find this argument without merit.

As to the nature of petitioner's involvement in the sale of Cal-Am securities we are confined primarily to the statements made by Togo Tanaka at the hearings held by the NASD District Business Conduct Committee and the NASD Board of Governors. Tanaka was a client of petitioner for whom petitioner had planned estate and tax programs for twenty years. Tanaka regarded himself as a typical example of the manner in which petitioner dealt with his clients and in his opinion other clients approached petitioner and were treated by him in the same fashion.

The thrust of Tanaka's testimony was that petitioner had never solicited him for anything. On the contrary, Tanaka explained that he had sought out petitioner in accordance with the practice he had followed for many years of finding out at regular intervals what tax shelter investments petitioner was making on his own behalf. Petitioner told him that he had invested through Gatliff in limited partnerships holding coal mining leases. Petitioner did not, however, recommend, advise or in any respect urge Tanaka to invest in the partnerships. Rather, he advised Tanaka to make his own investigation as to the value of the leases and their usefulness as a tax shelter. (This Tanaka subsequently did and in depth.) Petitioner also informed Tanaka that he would obtain a finder's fee if Tanaka made an investment, and Tanaka signed a written acknowledgment that he had been so informed. Petitioner did not participate in any discussions Tanaka had with Gatliff.[4]

In petitioner's view, this evidence demonstrates *no more than that he responded to an inquiry* as to what investments he had made on his own behalf; that,

if anything, he cautioned his clients against making the investment without securing independent investigation and advice. Petitioner's innocuous characterization of his conduct, however, overlooks the context in which the inquiry and response occurred. This was no friendly accommodation on petitioner's part. It was a professional contact. Petitioner must surely have been aware of the reputation he had gained as a successful investor in tax shelters. The practice of his clients to ascertain what investments he had made must have told him clearly that his judgment was valued and would be relied upon. By his response to his client's inquiry, then, petitioner disclosed acts of his that spoke louder than any oral expression could to the effect that in his judgment the coal mining leases were a sound investment. Disclosure of the fact and magnitude of his own investment overwhelmed any attempt on his part to disassociate himself from his client's subsequent purchases. The inference is inescapable that it was petitioner's reputation that Gatliff was bargaining for in offering a 15% referral fee. As a knowledgeable businessman, petitioner was surely not so naive as to be unaware of the basis for the high value placed upon his references.

Petitioner, then, was in the very profitable business, on a continuing basis, of putting his clients in touch with Cal-Am and its underwriters by means of entertaining and responding to his clients' inquiries. In our view, these activities were of sufficient significance to amount to participation in the sales that followed from his references. Accordingly, we hold that substantial evidence supports the Commission's determination that petitioner had as an underwriter participated in the sale of unregistered securities.

II

The Commission also affirmed the NASD determination that petitioner had violated the NASD Rules of Fair Practice by failing to notify his employer of his participation in

---

4. Petitioner did arrange with Gatliff to have the rider providing for the removal of the general partner included in the partnership agreements signed by the persons whom he referred.

the sale of Cal-Am securities. Again the question before us is whether this finding is supported by substantial evidence.

Pursuant to Section 15A(b)(6) of the Exchange Act, 15 U.S.C. § 70*o*–3(b)(6), NASD has promulgated rules "designed to prevent fradulent and manipulative acts and practices, to promote just and equitable principles of trade * * * and, in general, to protect investors and the public interest * * *." Among these is Article III, Section 1 of the NASD Rules of Fair Practice, NASD Manual (CCH) ¶ 2151, p. 2014, which provides: "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." To implement this rule, the Board of Governors has issued an interpretation concerning private securities transactions. In relevant part it provides:

It shall be deemed conduct inconsistent with just and equitable principles of trade for any person associated with a member to engage in a private securities transaction outside the regular course or scope of his association or employment with a member, for himself, or with or for any other person without prior written notification to the member.

NASD Manual (CCH) ¶ 2177, p. 2109–3.[5]

■ Petitioner does not dispute that he failed to inform his employer of his involvement in the sale of Cal-Am securities. The only question, then, is whether his involvement fell within the proscription of the Board of Governors' interpretation. We concluded above that substantial evidence supports the Commission's determination that petitioner participated in the sale of unregistered securities. In our view, that same evidence of participation is sufficient to find that petitioner "engage[d]" in a private securities transaction without notification to his employer, and therefore violated the NASD rules.

Petitioner argues that he was unaware of the NASD requirement that employers be informed of such outside securities activities. However as the Board of Governors stated in its decision, "Sirianni had a duty to read the firm's compliance guidelines and the Association's Manual. Had he read either, he would surely have known of his responsibility to clear such private transactions with his employer."[6]

### III

The NASD ordered that petitioner be fined $50,000 and suspended for one year from association with any NASD member. SEC affirmed these sanctions finding that they were not "excessive or oppressive." Petitioner renews his challenge to the sanctions here.

"Because 'the relation of remedy to policy is peculiarly a matter for administrative competence' . . . we will not disturb SEC sanctions unless they are either unwarranted in law or without some justification in fact." *Hinkle Northwest, Inc. v. SEC*, 641 F.2d 1304, 1310 (9th Cir. 1981), *quoting American Power & Light Co. v. SEC*, 329 U.S. 90, 112, 67 S.Ct. 133, 145, 91 L.Ed. 103 (1946).

■ On this record we can hardly say that the Commission abused its discretion in finding that the sanctions imposed were justified by the circumstances. It stated:

Sirianni asserts that the sanctions imposed by the NASD are excessive and oppressive. He asserts, among other things, that any violations he committed were technical in nature, that he consulted with counsel who did not alert him to the problems involved in his proposed course of conduct, that he did not believe that he was violating any statute or regulation, and that he has never previously been the subject of disciplinary action.

---

5. The introduction to this interpretation states that the "Board of Governors has determined that no person may be *involved in any way* with a private securities transaction outside the regular course or scope of this association or employment without prior notice to the member with whom he is associated." NASD Manual (CCH) ¶ 2177, p. 2109–3 (emphasis added).

6. CGE had issued to all its registered representatives a compliance manual which clearly indicated that they were to notify CGE of their involvement in any non-CGE-sponsored private investment program. It also warned against representatives accepting commissions or finder's fees in connection with any such program.

We cannot agree that the violations in which Sirianni engaged were merely technical. The registration provisions are a keystone of the entire system of securities regulation, and set forth basic requirements for the protection of investors. And, as we have previously pointed out, a salesman's "private" securities transactions deprive the public of protection it is entitled to expect, and may expose the salesman's employer to unwarranted risks. We further note that the fine assessed against Sirianni is far less than the profits he earned from his improper conduct. (Footnotes omitted.)

We find this a sound analysis.

As to warrant in law, petitioner argues that the $50,000 fine is in excess of the maximum fine of $5,000 per violation authorized by the NASD rules.[7] Petitioner reasons that he committed at most two violations: (1) participating in the sale of unregistered securities (2) without notifying his employer. The Commission rejected this argument finding that petitioner had committed both violations each time he had participated in a sale of Cal-Am securities. SEC's position finds support in its past rulings that each breach of a single duty constitutes a separate violation for purposes of calculating a maximum fine. *See In re First Philadelphia Corp.*, 45 S.E.C. 73, 74 (1972); *In re Voelkel*, 42 S.E.C. 674, 677 n.13 (1965); Securities Exchange Act Release No. 12182 (March 9, 1976), 9 SEC Docket 137. We find the sanction warranted.

The order of the Securities and Exchange Commission is AFFIRMED.

---

**7.** Article V, section 1, of the NASD Rules of Fair Practice provides that the Board of Governors may impose "a fine not in excess of Five Thousand Dollars ($5,000.00) ... for each or any violation" of an NASD rule. NASD Manual (CCH) ¶ 2301, p. 2114.