W. T. MOREY, Plaintiff-Appellant, v. EDWARD D. JONES & COMPANY, Defendant-Appellee.

Fourth District   No. 4—87—0061

Opinion filed September 10, 1987.

Marcia H. Morey, of Morey & Shade, Ltd., of Decatur, for appellant.

Michael I. Campbell and Jeff Justice, both of Hull, Campbell & Robinson, of Decatur, for appellee.

JUSTICE LUND delivered the opinion of the court:

W. T. Morey (plaintiff) and Edward D. Jones and Company (defendant) entered into a contract for the purchase of certain stock. Defendant later cancelled the contract citing an interpretation of article III, section 1, of the National Association of Securities Dealers' (NASD) Rules of Fair Practice. (NASD Rules of Fair Practice, art. III, sec. 1, National Association of Securities Dealers, Inc., Manual (CCH) par. 2151.06 (1971)) (hereinafter referred to as the NASD Manual).) Plaintiff filed a complaint for breach of contract. Upon motion of the defendant, the circuit court of Macon County granted summary judgment in favor of defendant. Plaintiff appeals.

Plaintiff is a lawyer residing in Decatur, Illinois. At the time of the transaction involved in this case, he was also chairman of the board of directors of Soy Capital Bank and Trust Company. He served on the bank's executive, personnel, audit, and loan committees. Soy Capital Bank and Trust Company is a wholly owned subsidiary of SCB Bancorp, Inc. The total number of shares issued and outstanding of SCB Bancorp, Inc., is 93,359. The plaintiff or his family affects the voting of approximately 18% of the total shares.

Plaintiff has an account with defendant, Edward D. Jones and Company. Defendant is a Missouri limited partnership with principal offices in St. Louis, Missouri. Defendant is a stockbroker doing business throughout the Midwest. It maintains two offices in Decatur and is a member of the NASD. Plaintiff has, apparently, done business with the defendant on an occasional basis since 1966.

Defendant was allocated 11,500 shares of Marine Corporation, an Illinois bank holding company, as part of a public offering of 465,000 shares. On March 13, 1986, one of defendant's Decatur representatives, Frederick Owings, called plaintiff and advised him of the proposed offering of Marine Corporation stock, stating the anticipated price per share to be between $20.50 and $22.50. Plaintiff indicated he would be interested. On March 18, 1986, Owings again called plaintiff and stated the price was set at $23 per share. Plaintiff placed an order for 500 shares for a total price of $11,500. Payment was due on March 25, 1986. A written order confirming the purchase and sale contract was mailed to plaintiff by defendant.

Defendant states in its answer that the order was cancelled on March 18, 1986, because the issue was selling at a premium as of that date. Prior to receiving payment, defendant informed plaintiff of the cancellation of his order, and further stated that the cancellation was due to plaintiff's status as a bank director, citing NASD rules.

The rule involved in this case is an interpretation of article III, section 1, of NASD's Rules of Fair Practice. Article III, section 1, states a general ethical rule:

> "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." (NASD Manual, par. ____.)

An "interpretation" of this ethical standard adopted by the NASD's Board of Governors deals with the abuse of "free-riding and withholding." In relevant part, it states:

> "Except as provided herein, it shall be inconsistent with high standards of commercial honor and just and equitable principles of trade and a violation of Article III, Section 1 of the Association's Rules of Fair Practice for a member, or a person associated with a member, to fail to make a bona fide public distribution at the public offering price of securities of a public offering which trade at a premium in the secondary market whenever such secondary market begins regardless of whether such securities are acquired by the member as an underwriter, a selling group member or from a member participating in the distribution as an underwriter or selling group member, or otherwise. Therefore, it shall be a violation of Article III, Section 1 for a member, or a person associated with a member to:
>
> * * *
>
> 4. Sell any securities to any senior officer of a bank, savings and loan institution, *** or to any person in the securities de-

partment of, or to any employee or any other person who may influence or whose activities directly or indirectly involve or are related to the function of buying or selling securities for any bank, savings and loan institution, \* \* \*;
\* \* \*

Provided, however, a member may sell part of its securities acquired as described above to:

(a) persons enumerated in paragraphs (3) or (4) hereof; and

\* \* \*

if the member is prepared to demonstrate that the securities were sold to such persons in accordance with their normal investment practice with the member, that the aggregate of the securities so sold is insubstantial and not disproportionate in amount as compared to sales to members of the public and that the amount sold to any one of such persons is insubstantial in amount." (NASD Manual, par. 2151.06.)

The terms "normal investment practice," "disproportionate," and "insubstantiality" are explained in the latter part of the interpretation.

The Marine Corporation stock value continued to rise after the initial offering.

Plaintiff filed a complaint on July 18, 1986, alleging breach of contract. On September 25, 1986, defendant filed an answer which admitted the material facts of the complaint but denied liability. Also, on September 15, 1986, defendant filed a motion for summary judgment asserting an "interpretation" of a NASD rule which prohibits a sale to certain individuals, among them senior bank officers, when the stock begins trading at a premium in the secondary market. NASD Manual, par. 2151.06.

A hearing on defendant's motion was held on November 14, 1986, and the matter was taken under advisement, with the court granting the motion by written order entered on January 14, 1987. The order included no findings of fact or conclusions of law, but merely stated the ruling in favor of defendant and the order granting summary judgment.

Plaintiff argues summary judgment was improper for two reasons. He argues (1) the NASD Rules of Fair Practice do not apply to a customer of a member-broker, and (2) if the rules do apply, it remained to be determined whether any of the exceptions to the particular "interpretation" applied to plaintiff.

The NASD is a voluntary association of brokers and dealers registered with the Securities Exchange Commission under section 15A of the Securities Exchange Act of 1934 (15 U.S.C.A. sec. 78o—3(a) *et seq.* (West 1981 & Supp. 1987)). (69 Am. Jur. 2d *Securities Regulation—Federal* secs. 401, 420 (1973); *Sirianni v. United States Securities & Exchange Com.* (9th Cir. 1982), 677 F.2d 1284, 1285.)

> "[The NASD] is composed of firms who sell securities in the over-the-counter market. The [Securities] Exchange Act [of 1934] requires NASD to regulate the conduct of its members by promulgation of rules designed to protect investors and to promote just and equitable principles of trade. 15 U.S.C. sec. 78o—3(b)(6). NASD has adopted such rules and enforces them through imposition of disciplinary sanctions." (677 F.2d 1284, 1285.)

While the great majority of brokers and dealers trading in over-the-counter securities are members of the NASD, it is not a requirement that one be a member. As a consequence, a substantial number of brokers and dealers are not members. 69 Am. Jur. 2d *Securities Regulation—Federal* sec. 364 (1973).

With respect to the rules of stock exchanges, it has long been held that the one who transacts business:

> "[A]t a particular market will be taken to have dealt according to the known general custom and usage of the market, and if he employs another to act for him in buying or selling at such market, he will be held as intending that the business should be conducted according to such general usage and custom of such market; and this has been held to be the rule whether he in fact knows of the custom or not." *Samuels v. Oliver* (1889), 130 Ill. 73, 79, 22 N.E. 499, 500-01; see also 12 Am. Jur. 2d *Brokers* sec. 119 (1964).

However, no case has been found which directly applies this principle to over-the-counter transactions involving brokers operating under NASD rules. Three cases have been found which distinguish the NASD from stock exchanges.

In *Hyman v. Sachs* (1948), 194 Misc. 69, 86 N.Y.S.2d 237, *aff'd* (1949), 275 A.D. 804, 89 N.Y.S.2d 608, *aff'd* (1949), 300 N.Y. 499, 89 N.E.2d 20, the NASD determined that contracts for the delivery of certain bonds be cancelled. The plaintiff, a customer of the defendant brokers, demanded delivery and brought an action to compel delivery. The court found that the NASD resolution was not binding on the plaintiff:

> "As to the first question, a person who instructs a broker to

carry out a certain transaction which would necessarily, or even ordinarily, involve its being carried out on a certain exchange, is bound by the rules of that exchange. [Citation.] But we do not have that situation here. The N.A.S.D. was not an exchange. Plaintiff was not even aware of its existence, and it is not so widely known that she could be held chargeable with such knowledge. There is nothing to show that she contemplated or even ought, in the usual course, to have suspected that her order would entail compliance with the rules of any such body. As being chargeable with such knowledge is the basis of binding a customer to the rules of an exchange, the absolute lack of it prevents any such consequence." (194 Misc. 69, ___, 86 N.Y.S.2d 237, 239-40.)

However, the court in *Hyman* held for the defendant brokers on other grounds and ordered judgment for defendants.

*Harwell v. Growth Programs, Inc.* (W.D. Tex. 1970), 315 F. Supp. 1184, dealt with a breach of contract action against a broker member of the NASD. All of the investment contracts sponsored by the defendant broker contained "withdrawal and reinvestment clauses." The use of these clauses caused speculative short-swing trading, and the NASD issued an "interpretation" halting such use of these clauses. The defendant complied with the ruling and violated its contracts with the plaintiffs, the investors. Plaintiffs brought an action seeking, among other things, to enjoin defendants from further breach of the contracts. The Federal district court held that the defendants could not be held liable for breaching their contracts with the plaintiffs because they had obeyed the ruling of the NASD. The court found the NASD ruling to be a quasi-governmental action excusing the breach of contracts by defendants. The court granted summary judgment for defendants. The court of appeals for the Fifth Circuit reversed, holding the issues were not properly disposed of by summary judgment. The court of appeals found issues remaining about several areas of the lower court's decision, but with respect to the breach of contract claims, it stated:

"It is generally conceded that [defendant] breached its contracts with the plaintiffs. After an examination of all of the facts, the court can determine whether [defendant] might be liable for damages, even if the court should determine that the contracts cannot be specifically enforced. The parties to a contract rendered impossible to perform by government regulation are not always excluded from the exposure to liability. The NASD interpretation does not make the contract illegal but

only makes it improper for the NASD members to be involved with it. There is a distinction between a literal impossibility of performance and mere economic inadvisability. [Citation.] The representations [defendant] made on the sale of the contracts to plaintiffs, the extent to which [defendant] was involved in the administrative process, the extent to which it could have preserved the possibility of performance, the extent to which it encouraged the plaintiffs' so-called 'abuse' of the 'in-and-out' privilege are all facts which must first be determined before a decision can be made as to whether any remedy is available to plaintiffs for the admitted breach of their contracts. [Citation.]" *Harwell v. Growth Programs, Inc.* (5th Cir. 1971), 451 F.2d 240, 245.

The third case is *Newman v. First California Co.* (1975), 47 Cal. App. 3d 60, 120 Cal. Rptr. 494, *cert. denied* (1975), 423 U.S. 928, 46 L. Ed. 2d 256, 96 S. Ct. 276. In *Newman*, one of the defendants, a stockbroker named Talbot, informed plaintiff that a profit might be made on the purchase of certain stocks. On February 17, 1969, several days after the first phone call, plaintiff placed a written order for the stock. That same day, Talbot, the broker, did the following:

> "Talbot teletyped to First California's San Francisco office the matching buy and sell orders for all of the [seller's] stock. *** [H]e left a telephoned message for Newman that the deal was going through and details would follow in a day or two. He also wrote a brief confirming letter: 'Your order has gone thru. The 30 shares will be confirmed in your name.' Later that day, Talbot went to [plaintiff's] office and had him sign the order to buy 30 shares. Talbot said he had made a special trip and had secured the stock and told [plaintiff], 'you've got a deal.' He did not mention any conditions that had to be met. [The plaintiff] understood the sale was complete except for registration, transfer and issuance of new certificates in his name." (47 Cal. App. 3d 60, 64, 120 Cal. Rptr. 494, 496.)

On February 21, plaintiff went to the broker's office and was told the order would not be confirmed because the price was no longer fair. At trial, defendants asserted a defense to plaintiff's breach of contract and negligence action based on NASD rules. Because the stock was rarely traded, and it was difficult to ascertain market price, defendants asserted the NASD required the broker "to make an independent investigation of the price for fairness to both sides despite the fact the price had been agreed upon in the negotiations with sellers and buyers." (47 Cal. App. 3d 60, 64, 120 Cal. Rptr. 494,

496.) The lower court allowed the matter to proceed to trial, however, and plaintiff received a jury award. In upholding the verdict, the California Appellate Court again distinguished the NASD from an exchange:

> "[Defendants] cite cases holding that a person trading on an exchange is bound by contract to its rules and customs. [Citations.] They are not applicable because the subject transaction was not on an exchange. The NASD was established by the Maloney Act of 1938 as a self-regulating association of members who participate in over-the-counter market transactions. Membership is not mandatory but carries privileges to participate on a preferential basis. [Citation.] [Defendants] have failed to demonstrate that NASD rules have the same status as those regulating the national exchanges. [Citations.]" 47 Cal. App. 3d 60, 65, 120 Cal. Rptr. 494, 497.

In summary, the authorities presented to us and that we have found support plaintiff's position as to the effect of NASD rules on customers. Defendant has failed to prove that NASD rules apply to customers in the same way as the rules of stock exchanges. Further, no evidence was provided about the publication of NASD rules. The record is devoid of any evidence indicating plaintiff was advised of NASD requirements prior to, or at the time of, the creation of a binding contract to sell and purchase the bank shares. Finally, the record of the lower court proceeding is brief. No trial record was made of the summary judgment hearing. The record on appeal consists only of the common law record, which contains the complaint, the answer, the motion for summary judgment, and certain answers to interrogatories.

The authorities we have found and the scant record compel us to hold that the trial court erred in applying the NASD rules to plaintiff and granting summary judgment for defendant.

Plaintiff also argues that, if the NASD rules apply to customers of members, the proceedings in the lower court did not progress far enough to determine whether the particular "interpretation" at issue applied to plaintiff. If plaintiff does fall under the interpretation, he further argues evidence should have been taken as to whether he fits under the exceptions to the interpretation. Defendant responds by arguing that plaintiff presented no evidence at the summary judgment hearing, and, therefore, plaintiff should not be allowed to assert this theory on appeal.

Because of our ruling above, we need not consider these arguments. We suggest that it would have been prudent for plaintiff to

file counteraffidavits allowed under section 2—1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005), setting forth the applicability of the exceptions.

The order of the circuit court of Macon County granting summary judgment for defendant is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

McCULLOUGH and KNECHT, JJ., concur.