**ATLANTA–ONE, INC.; Kevin M. McCarthy; Thom Blodgett, Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 95–70360.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 1996.

Memorandum Aug. 1, 1996.

Decided Nov. 12, 1996.

reversal is required.") (citations omitted).

Thom Blodgett, Irvine, CA, for petitioners.

Allan A. Capute, Special Counsel to the Solicitor, Securities and Exchange Commission, Washington, DC, for respondent.

Before: WIGGINS, THOMPSON, and TROTT, Circuit Judges.

## ORDER

The Memorandum disposition filed August 1, 1996, is redesignated as an authored Opinion by Stephen S. Trott, Circuit Judge.

## OPINION

TROTT, Circuit Judge:

### OVERVIEW

This is a petition for review of a Securities and Exchange Commission Decision holding that Petitioners Atlanta–One, Kevin McCarthy, and Thom Blodgett violated rules of fair practice by charging customers unfair commissions. Petitioners argue: 1) there is not substantial evidence to support the SEC's finding that Atlanta–One charged excessive commissions; 2) that they were denied due process; 3) that the National Association of Securities Dealers (NASD) and the SEC are attempting to "fix" the maximum rate of commission charged by a broker; and 4) that the SEC abused its discretion in affirming the sanctions against Petitioners. We deny the petition.

## STANDARD OF REVIEW

 The findings of the SEC as to the facts are conclusive if supported by substantial evidence. 15 U.S.C. § 78y(a)(4). If the evidence is susceptible to more than one rational interpretation, this court must uphold the SEC's findings. *Eichler v. Securities Exch. Comm'n,* 757 F.2d 1066, 1069 (9th Cir.1985). Sanctions imposed by the SEC are reviewed for an abuse of discretion. *Sirianni v. U.S. Securities & Exch. Comm'n,* 677 F.2d 1284, 1288 (9th Cir.1982).

## DISCUSSION

### I

### SEC's Finding of Excessive Commissions

Section 1 of Article III of the NASD Manual requires NASD members to "observe high standards of commercial honor and just and equitable principles of trade." NASD Manual ¶ 2151. Section 4 of Article III of the manual states that a member:

[S]hall not charge his customer more than a fair commission or service charge, taking into consideration all relevant circumstances including market conditions with respect to such security at the time of the transaction, the expense of executing the order and the value of any service he may have rendered by reason of his experience in and knowledge of such security and the market therefor.

NASD Manual ¶ 2154.[1]

 In March 1995, following a de novo review of the record from the NASD's District Business Conduct Committee (DBCC) and the National Business Conduct Committee (NBCC), the SEC held that Atlanta–One's commissions were excessive. The following evidence supports this conclusion. In 252 of the 353 trades between April and November of 1990, or 71% of the trades, the commissions amounted to at least 40% of the customer's initial investment. Commissions exceeded 70% of the initial investment in several instances and ranged as high as 89%. Consequently, customers who were able to

sell their options at a gain often lost money once commissions were taken into account. There were 141 transactions that showed a pre-commission profit, but after commissions were deducted those profits were wiped out in 40% of the cases. Customers realized an after-commission profit in only 84, or 24%, of the 353 transactions.

No reasonable broker could think it could fairly charge commissions so high as to make it almost impossible for the client to make money. The customer's objective in investing is to generate a profit, and a broker is expected to promote that objective. As summarized by the SEC:

Implicit in the concept of fair pricing of commissions is the notion that the commissions must not be so excessive as to make it unlikely that the customer's investment could appreciate sufficiently to compensate the customer for the commission and generate a profit.

SEC Decision at 5–6.

Petitioners argue that they provided unique and special services and incurred high expenses, which justified higher commissions. However, the evidence shows otherwise. The firm did not engage in its own research. Atlanta–One's staff did not generally meet with clients in person. The firm had little or no litigation expenditures or reserves. It did not incur advertising expenses except for the purpose of hiring its own employees. In sum, the firm simply incurred ordinary operating costs such as phone bills and employee salaries.

Atlanta–One contends that, as a small firm, it needed to charge higher commissions in order to stay afloat. However, the SEC rejected this argument, stating that if the sales of the highly speculative securities were too low to support the operating costs of the firm, the firm needed to make changes (i.e. lower salaries or diversify its product base) to generate a more efficient return. It could not try to cover its expenses by charging excessive commissions. As noted by the SEC, "the fairness to be considered is fair-

---

1. Although Section 4 deals with the appropriate level of compensation in retail transactions in the over-the-counter market, the section provides guidance by analogy as to appropriate commissions for exchange transactions.

ness to the customer, not the broker-dealer." As noted by the National Business Conduct Committee (NBCC) in its review of this case:

> [E]ven if the respondents had demonstrated the existence of extraordinary costs, it is our view that respondents were not free to pass along those costs to the customers. Instead, if respondents' costs were so high that they could only be recouped through commissions that would all but eliminate customers' opportunity to make a profit on foreign currency options, respondents' only choice was to refrain from offering foreign currency options to the public.

NBCC Decision at 8.

█ Finally, Petitioners argue that because the commissions were disclosed they were allowable. However, Petitioners' disclosure of the commission rate is only one factor considered in determining the fairness of the commission, and it does not suspend the rule that the commission charged must not be excessive. *See* NASD Manual ¶ 2154 (commenting that "disclosure itself" does not justify commission which is excessive "in light of all other relevant circumstances"); *DBCC for District No. 2S v. Cornwall, Abbott & Gray, Inc.*, 1989 NASD Discip. LEXIS 71 (October 18, 1989) (finding that although commissions were disclosed, they were excessive and violated the Rules of Fair Practice). Often the investors who rely on a broker such as Atlanta–One lack the sophistication to understand the precise impact of the commission rate and its fairness, making the commissions' disclosure somewhat meaningless. This case does not present a "close call" of commissions that were slightly in excess of a fair rate. Instead, Atlanta–One charged commissions at a rate far exceeding a level that could be considered fair.

Thus, the evidence shows that Atlanta–One did not render special services, and it did not incur extraordinary expenses. Instead, the evidence indicates that Atlanta–One was charging exorbitant rates and taking advantage of unsophisticated investors. Thus, we conclude that substantial evidence supports the SEC's finding that Atlanta–One charged excessive commissions.

## II

### Due Process Violations

Petitioners raise several arguments that their due process rights were violated. They argue: 1) that Atlanta–One did not have notice of what commission would be fair and that the NASD Manual is too vague to provide guidance; 2) that the NASD did not allow them to produce the testimony of their expert witness; and 3) that the NASD improperly shifted the burden of proof to Atlanta–One.

### A. Lack of Notice and Guidance about Fair Commissions

█ Petitioners primary due process contention is that they did not have notice that the commissions they were charging were excessive. The SEC refutes this argument, finding that guidance as to what constitutes an unfair commission was available from the NASD's Rules of Fair Practice, from the NASD's mark-up policy, and from cases involving excessive trading and other violations where the investor's interests are subordinated to the interests of the broker or dealer.

In its decision below, the SEC stated:

> Although the authorities available to Applicants at the time of the transactions at issue were not clear as to the direct applicability of the 5 percent guideline, the existence of the policy should have put Applicants on notice that commissions that were [in] significant multiples of that number might be considered unfair . . . .

> Even the most general proscriptions against gouging customers that may be gleaned from either mark-up or excessive trading cases placed Applicants on notice that grossly excessive commissions would not be tolerated consistent with just and equitable principles of trade.

SEC Decision at 6–7.

The 5% mark-up policy refers to principal transactions where a dealer is selling stock he owns to his customer. The NASD promulgated the 5% policy to provide a guideline as to what a fair spread or profit would be when the dealer marks-up the wholesale price of the stock. At the time of the trans-

actions at issue here, the 5% guideline had not been expressly applied to commissions. However, the underlying principles of fairness articulated in Section 4 of Article III of the NASD Manual apply to commissions as well as to mark-ups. The SEC concluded that while no decisions expressly applied the 5% policy to commissions, the policy put Atlanta–One on notice that commissions in significant multiples of that number would be considered unfair.

Furthermore, in 1990, the NASD told Atlanta–One that a recent case had been decided which found that a firm was charging excessive commissions for foreign currency options. The case of *Cornwall, Abbott & Gray,* 1989 NASD Discip. LEXIS 71 (October 18, 1989), involved violations similar to those charged against Atlanta–One. In that case a complaint was brought by the NASD against Cornwall for charging unfair prices in approximately 32 transactions in foreign currency options. The firm had a practice of charging a $125 fixed rate per contract to open the position, and between $5 and $25 to liquidate the position. Those commissions were found to range from a low of 9.41% to a high of 25.97% of the prices paid by customers. The majority of the transactions involved commissions of between 17% and 21% of the price the customer paid. The expense incurred by the firm was $12 per contract.

The DBCC rejected Cornwall's assertion that it had incurred unusually high expenses as compared to other firms. After considering the relevant factors, the DBCC found that:

> the foreign currency options traded by these respondents were readily available in the market and that they were sold to unsophisticated investors with little market experience and on a largely solicited basis. Hence, even though the amount of the commissions was disclosed, we do not believe these investors were in a position to understand the charges.

*Cornwall,* DBCC Decision at 3. The DBCC levied sanctions against Cornwall in the amount of $15,000 plus the costs of the proceeding.

This case provided adequate guidance that excessive and inequitable commissions violate the NASD's Rules of Fair Practice. The argument that the NASD's guidelines were too vague or subjective fails because the commissions at issue here were clearly over the line of fairness, not in a gray area. The data presented reflects that the commissions ranged up to 89%, and that in only 24% of the transactions the customers realized a profit. No reasonable broker could have thought that the commissions being charged were fair as a matter of common sense, much less in light of the guidance provided by the NASD Manual and by similar policies and cases involving excessive trading and mark-ups. Thus, in light of the degree to which the commissions charged by Atlanta–One were excessive, this "lack of guidance" argument fails.

### B. Exclusion of Testimony of Expert Witness

■ Petitioners did not properly raise the argument about the wrongful exclusion of the testimony of Dr. Teweles before the NBCC. The NBCC found that this was a conscious, tactical decision. Thus, this issue is not properly before this court.[2]

### C. Burden of Proof

■ The Petitioners' burden of proof argument is similarly meritless. The NASD did not shift the burden of proof to Atlanta–One. Instead, the NASD's investigation and data indicated that Atlanta–One's commissions were excessive. The NASD presented the data and its allegation that Atlanta–One had violated the Rules of Fair Practice. During the DBCC hearing, Atlanta–One was asked to explain what sort of special services it rendered and to justify why its commissions were so high. This did not constitute an impermissible shifting of the burden of

---

2. Even if this argument had been properly raised, it would not have affected the outcome of this case. As noted by the SEC, the commissions were so far above the line of fairness that it is unimaginable that Atlanta–One's expert could have presented testimony that would have somehow made these commissions appear fair. Thus, any due process error attributed to the DBCC's failure to allow the expert testimony was harmless error.

proof. It simply constituted the normal hearing process during which Atlanta–One was asked to explain the commissions alleged to be excessive.

## III

### NASD's and SEC's Fixing of Commissions

A major focus of this petition involves the Petitioners' assertion that the NASD and SEC have developed a "secret" and "ingenious" strategy of applying the 5% mark-up policy to commissions. Petitioners cite several cases in support of this position. However, this panel does not need to address the merits of what the NASD and SEC have done in those cases. In this case, the SEC simply pointed to the 5% mark-up policy to show that the commissions charged here, which far exceeded the 5% amount, were obviously unfair and that Atlanta–One knew or should have known that they did not comply with NASD requirements and guidelines. Neither the NASD nor the SEC ever stated that the commissions could not exceed the 5% mark without being considered excessive. Instead, the NASD and SEC made it clear that the fairness of a commission depends on the consideration of several relevant factors.

This case involves excessive commissions that blatantly exceeded a fair and equitable level-exceeding 40% in 71% of the transactions and ranging up to 89%–not wrongful fixing of commissions by the SEC. The fact that the NASD cannot fix minimum profits or prices does not negate the requirement that commissions be fair. The SEC described Atlanta's violations as involving "grossly" excessive commissions; they did not constitute a slight departure from acceptable commission amounts. Accordingly, due to the degree to which the commissions were excessive, which far exceeded the 5% mark, this is not the case in which a court needs to address an alleged scheme of "fixing" commissions by the SEC.

## IV

### Sanctions

Petitioners argue that the sanctions imposed by the NASD were oppressive, excessive, and inappropriate for first time offenders. The SEC, however, found that the sanctions were warranted "given the extraordinary number of grossly excessive commissions at issue in this case." The guidelines recommend sanctions equivalent to the gross amount of the excessive mark-up or mark-down plus $5,000 to $50,000. The guidelines do not set a particular fine or sanction, instead they simply provide a starting point.

Here, the NASD imposed monetary fines, brief suspensions, and requalification requirements. The SEC found that the commissions charged by Atlanta–One were so far out of line with acceptable rates that the NASD's sanctions were warranted. The transaction data revealed that only 24% of the 353 transactions resulted in a net profit. In sum, Atlanta–One was charging an excessive commission up-front and taking advantage of unsophisticated investors. Although the sanctions are harsh, the transactions at issue involved serious violations of "grossly excessive commissions." Thus, the SEC acted within its discretion when it upheld the sanctions imposed by the NASD.

PETITION DENIED.