**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,
             *Plaintiff-Appellee,*

HENRY C. YUEN; ELSIE M. LEUNG,
      *Intervenors-Appellants,*

v.

GEMSTAR-TV GUIDE INTERNATIONAL,
INC.,

               *Defendant.*

No. 03-56129

D.C. No.
CV-03-03124-
WMB/MRP

OPINION

Appeal from the United States District Court
for the Central District of California
Wm. Matthew Byrne, Jr., District Judge, Presiding

Argued and Submitted
December 15, 2004—Pasadena, California

Filed March 22, 2005

Before: Mary M. Schroeder, Chief Judge, Stephen Reinhardt,
Stephen S. Trott, Sidney R. Thomas, Susan P. Graber,
M. Margaret McKeown, Kim McLane Wardlaw,
Raymond C. Fisher, Richard R. Clifton,
Consuelo M. Callahan, and Carlos T. Bea, Circuit Judges.

Opinion by Judge Trott;
Concurrence by Judge Reinhardt;
Dissent by Judge Bea

## COUNSEL

Michelle Rice, Arkin Kaplan LLP, for Yuen & Leung, New York, New York, for the intervenors-appellants.

Richard M. Humes, Securities and Exchange Commission, Washington, D.C., for the plaintiff-appellee.

Thomas J. Karr, Securities and Exchange Commission, Washington, D.C., for the plaintiff-appellee.

Richard L. Stone, for Gemstar-TV Guide, for the defendant-respondent-appellee.

Kimberly S. Greer, Fish & Richardson, P.C., San Diego, California, for the defendant-respondent-appellee.

---

## OPINION

TROTT, Circuit Judge:

In response to a formal application by the Securities and Exchange Commission ("SEC" and "Commission"), the district court entered an order pursuant to Section 1103 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 78u-3(c)(3), placing in escrow in excess of $37 million representing contemplated one-time payments by Gemstar-TV Guide International, Inc. ("Gemstar"), a public corporation, to its resigning Chief Executive Officer ("CEO"), Dr. Henry Yuen, and its Chief Financial Officer ("CFO"), Elsie Leung. This escrow order — directed to Gemstar — was predicated upon the district court's conclusion under the statute that these payments, which were to be made during the course of a lawful investigation by the SEC of Gemstar involving possible violations of federal securities laws, were "extraordinary." Gemstar did not oppose the entry of this order and has not filed a substantive brief in connection with this appeal. However, Intervenors-Appellants Yuen and Leung do appeal, claiming (1) that this statute is unconstitutionally vague on its face and as applied to them; (2) that the district court erred as a matter of law in its interpretation of the statutory term "extraordinary payments"; and (3) that the district court erred in its determination that the payments in question could be deemed "extraordinary."[1] Title 28 U.S.C. § 1292(a)(1) gives us jurisdiction over this timely appeal, and we affirm.

---

[1]Appellants claim also that this statute violates the Fourth Amendment's prohibition against unreasonable searches and seizures. This assertion has no merit. As will be apparent from our discussion of the remaining issues, the formal administrative and judicial process established by Congress

# I

The civil statute under our microscope, Section 1103, 15 U.S.C. § 78u-3(c)(3), is narrow, well defined, and clear. It comes into play only

(1) during the course of a lawful investigation by the SEC,

(2) involving possible violations of the federal securities laws,

(3) committed by an issuer of publicly traded securities or any of its directors, officers, partners, controlling persons, agents, or employees,

(4) whenever it shall appear to the Commission that it is likely that the issuer will make extraordinary payments to any of those named persons.

*See* 15 U.S.C. § 78u-3(c)(3)(A)(I). Should this combination of events occur, as happened here, Congress has empowered the Commission to petition a federal district court for nothing

---

whereby assets might be "seized" in this industry pursuant to court order easily satisfies the Supreme Court's three-part test articulated in *New York v. Burger*, 482 U.S. 691, 702-03 (1987), which established an exception from the warrant requirement under certain delineated circumstances involving "closely regulated" businesses. First, the government's interest on behalf of the public that drives this process is certainly "substantial." Second, the process resulting, without a search, in a temporary "seizure" is patently necessary to further the regulatory scheme; and third, by involving the district courts as the decision-maker, the program as legislated is plainly "a constitutionally adequate substitute for a warrant." In sum, this process is "reasonable" as required by the Fourth Amendment. *See also United States v. V-1 Oil Co.*, 63 F.3d 909 (9th Cir. 1995) (applying the *Burger* test to regulated businesses transporting hazardous materials).

more onerous than a temporary order requiring the issuer under scrutiny to escrow those intended payments to a clearly defined group of insiders for no more than 45 days in a very familiar device, an interest-bearing account — all of this subject to court supervision.

This protocol on its face bears the hallmarks and indicia of due process of law and protection for the rights and interests of all concerned, including the public, the shareholders who own the corporation, and third-party creditors who hold corporate debt — as well as the persons to whom such payments might be made. It is a civil law that imposes no penalties, does not implicate any constitutionally protected behavior, and regulates only issuers of publicly traded securities. Enacted in the disturbing shadow of a flood of corporate scandals, its purpose is to temporarily protect corporate funds and the investing public and creditors against theft, fraud, and dissipation. As the Commission underscores in its brief, (1) the initial escrow lasts for only 45 days with the possibility of a single 45-day extension, *see* 15 U.S.C. § 78u-3(c)(3)(A)(I), (iv); (2) any person affected by the escrow order has the right to petition the court for relief, *see* 15 U.S.C. § 78u-3(c)(3)(B)(I); and (3) if no enforcement action is filed before the temporary escrow expires, the "extraordinary payments" involved shall be returned to the issuer or other affected person with accrued interest, *see* 15 U.S.C. § 78u-3(c)(3)(B)(ii).

The issues brought to us arise primarily from Congress' use of the word "extraordinary." The intervenor-appellants claim that the district court erred in its interpretation and application of the word "extraordinary" and that the word is so vague that it renders this entire process unlawful. Upon examination, these claims are unpersuasive.

## II

Faced with one cataclysmic corporate accounting scandal after another, including Enron, WorldCom, and Tyco, Con-

gress' purpose in enacting Section 1103's escrow measure
could not be clearer. One after another, many persons, compa-
nies, and pension plans have been left holding an empty bag
after corporate insiders committed fraud and other corporate
crimes and misdeeds at the ultimate expense of the corpora-
tion's shareholders, creditors, and innocent employees. By the
time the authorities have been alerted to the fraud, it's too
late; the assets of the company have already disappeared, ren-
dering the traditional remedies used by the Commission to
rectify such wrongs — disgorgement, civil penalties, restitu-
tion, etc. — difficult, if not impossible, to pursue. In the
meanwhile, the disappearance of such funds impoverishes and
damages the issuer itself, once again to the detriment of the
shareholders, creditors, and innocent employees, whose pen-
sions in many cases have been permanently thrashed. Ulti-
mately, our nation is the victim, as the public loses confidence
in the stock market.

Section 1103 was initially introduced as Amendment No.
4188 by Senator Trent Lott. *See* 148 Cong. Rec. S6542 (daily
ed. July 10, 2002). In the debate that ensued after Amendment
No. 4188's introduction, different senators focused on various
possible abuses that Section 1103 was meant to prevent:

> Section 3 freezes payments of potential wrongdo-
> ers. This section would allow the SEC, during an
> investigation, to seek an order in Federal court
> imposing a 45-day freeze on extraordinary payments
> to corporate executives. Again, this year we have
> seen just that sort of thing happening. While an
> investigation is underway, basically rewards were
> given to these corporate executives. While it would
> require a court order, there would be this 45-day
> freeze. The targeted payments would be placed in
> escrow, ensuring that corporate assets are not
> improperly taken from [sic] an executive's personal
> benefit. . . . We have also seen that there are some
> cases where the law had some loopholes or where it

was not timely or where it was not strong enough. One example, of course, is where there has been shredding. *Another example is the very bad image of corporate executives taking increased payments, extraordinary payments, while they are being investigated.* You can't have that sort of thing.

*Id.* at 56545 (statement of Sen. Lott) (emphasis added).

The House of Representatives shared these objectives:

Under this legislation, top executives will not be allowed to pilfer the assets of the company by giving themselves huge bonuses and other extraordinary payments if the company is subject to an SEC investigation. Their pay and benefits are frozen when the investigation starts. Americans will know that corporate officers will no longer be able to misuse the bankruptcy laws to discharge liabilities based upon securities fraud, and the honest brokers of corporate America will know that those who abuse the law and tarnish corporate America's reputation will go to jail for a long, long time.

148 Cong. Rec. H4685 (daily ed. July 16, 2002) (statement of Rep. Sensenbrenner). From this background, it is readily apparent that the intent of Congress in enacting this statute was to provide a strong shield for third-party creditors and corporate investors once the SEC begins an investigation of corporate malfeasance.

## III

The facts and circumstances of this case provide a textbook example of the problem. On April 1, 2002, Gemstar filed its Form 10-K report for the year 2001. The filing reported that $107.6 million Gemstar had previously claimed as revenue had not actually been realized. Gemstar revealed also that it

had claimed as substantial revenue receipts from a single "non-monetary transaction" that was not properly booked. The fallout from these reevaluations? The next day, Gemstar's stock price declined by a startling 37 percent. But, this was just the beginning. On August 14, 2002, Gemstar announced in a Form 8-K — a Commission report used to report "material events or corporate changes" that may have an effect on the value of a company's securities, *see* 15 U.S.C. § 78m(a)(1); 17 C.F.R. § 240.13a-11 — that it intended to restate its 2001 financial results and to reverse $20 million, plus make substantial corrections. Gemstar filed as exhibits to that Form 8-K sworn statements from CEO Yuen and CFO Leung, to the effect that they were not able to certify as required by law that some of Gemstar's financial statements were accurate, and that they were not able to comply with written Commission orders to do so.

On September 25, 2002, Gemstar filed yet another Form 8-K (1) confirming that it had been notified by NASDAQ that its securities were subject to delisting for failure timely to file a Form 10-Q for the quarter ending on June 30, 2002; (2) that because of an unresolved dispute between Gemstar and its independent auditor KPMG, the company could not file its quarterly Form 10-Q report; and (3) that the resolution of these accounting and financial matters involving restatement of financial statements was "uncertain" and "unpredictable." Clearly, the wheels were falling off this company.

What about Intervenors CEO Yuen and CFO Leung, whose compensation was tied to the performance of Gemstar's now-suspect reported financial results? On March 27, 2002, all of four days before the revelation to the public about Gemstar's inaccurate revenue claims, Yuen disposed of 7 million Gemstar shares, receiving an initial payment of $59 million. No doubt the purchasers of these shares believed they were getting fair value for their money, only to see the roof fall in when the facts became public.

Simultaneous with the internal and external unraveling of this creative accounting mess, CEO Yuen and CFO Leung were cutting a new deal with Gemstar's Board to "resign" from their respective executive positions — but remain as employees — in return for a payment in cash by Gemstar to Yuen of $29.48 million and to Leung of $8.16 million, plus large shares of stock and stock options. Yuen would receive approximately 5.27 million shares of restricted stock or stock units, and Leung would receive options to purchase in excess of 1.1 million shares of common stock and 353,680 shares of restricted stock or stock options. Gemstar reported these unusual developments on November 12, 2002, in yet another Form 8-K filing. Not surprisingly, the Commission commenced a formal investigation of this scenario to determine whether Gemstar and its former and present officers and directors had engaged in actionable securities fraud by making materially false and misleading public statements regarding revenue, earnings and losses, etc., for the relevant years. It is this package of "restructuring payments" around which Yuen and Leung fashion their unconvincing claims that the term "extraordinary" is vague, and, in any event, that the negotiated payments were not "extraordinary."

## IV

It is instructive to understand what must happen in order for the Commission to launch an investigation into suspected violations of the securities laws as a prerequisite to petitioning the court under Section 1103 for a temporary escrow.

Both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") give the Commission the authority to initiate investigations into suspected violations of the securities laws. *See* 15 U.S.C. § 77t(a) ("Whenever it shall appear to the Commission . . . that the provisions of this title . . . have been or *are about to be violated*, it may . . . investigate such facts." (emphasis added)); 15 U.S.C. § 78u(a)(1) ("The Commission may . . . make such

investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this title. . . ."). A formal investigation is the process by which the SEC issues subpoenas calling for document production or testimony, supported by the power of the federal courts. To enable the staff of the SEC, rather than the appointed members of the SEC, to perform such an investigation, the Commission must delegate its powers to the staff in a Formal Order of Investigation. That order consists of three parts: (1) a jurisdictional section setting forth the SEC's investigative authority; (2) a probable cause section setting forth the information which, "if true, tends to show" that certain activities have occurred and securities laws have been violated; and (3) a delegation section, containing a statement by the Commission that it is delegating its investigative power to the staff. Marvin Pickholz, SEC Crimes, § 2:4 (Dec. 2003); *see also* Am. Jur. Securities, Regulation-Federal § 1622 (noting that in most circumstances "[n]either a Commission decision whether to conduct a preliminary investigation nor a formal order of investigation is a final order which may be judicially reviewed").

Here, the Formal Order of Investigation, which was part of the Commission's submission to the district court pursuant to Section 1103, was signed on October 17, 2002. In relevant part, it says:

Members of the staff have reported information to the Commission which tends to show that from at least 1999 to the present:

A.  Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities, directly or indirectly, in the offer or sale of, or in connection with the purchase or sale of Gemstar securities, may have employed a device, scheme, or artifice to defraud, made or obtained money or property

by means of an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in transactions, acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person. As part of the aforesaid activities, such persons or entities may have, directly or indirectly, among other things, made materially false and misleading statements and may have traded in Gemstar stock while in possession of material nonpublic information in breach of a fiduciary or other duty arising out of a relationship of trust and confidence concerning, among other things, Gemstar's revenues and earnings or losses as set forth in Gemstar's 1999, 2000, 2001 and 2002 Forms 10-K and 10-Q;

B.  Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities failed or caused the failure to file or filed or caused to be filed with the Commission annual reports on Form 10-K and quarterly reports on Form 10-Q which may have contained an untrue statement of material fact or may have omitted to state a material fact necessary, or may have failed to add such further material information as may be necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading concerning, among other things, Gemstar's revenue and earnings or losses.

C.  Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities may have failed to or caused the failure to:

    1.   make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected Gemstar's transactions and disposition of assets;

    2.   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles or any other criteria applicable to such statements, and to maintain accountability for assets;

D.   Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities may have, directly or indirectly, falsified or caused to be falsified, books, records, or accounts required to be maintained by Gemstar.

E.   Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities may have knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified any book, record or account required to be maintained by Gemstar.

F.   While engaged in the above described activities, such person or entities, directly or indirectly, made use of the mails or the means, instruments, or instrumentalities of transportation or communication in interstate commerce.

The Commission, having considered the staff's report and deeming such acts and practices, if true, to be in possible violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder, finds it necessary and appropriate and hereby:

ORDERS, pursuant to Section 20(a) of the Securities Act and Section 21(a) of the Exchange Act, that a private investigation be made to determine whether any persons or entities have engaged in, or are about to engage in, any of the reported acts or practices or any acts or practices of similar purport or object;
. . . .

The next step in this process is for the Commission to file with the district court an application for a temporary freeze order pursuant to Section 1103. The Commission took this step on May 5, 2003, accompanied by a supporting declaration executed by the Commission's attorney authorized to conduct the relevant investigation. Here are excerpts from the declaration, excerpts that sound much like the allegations of probable cause to be found in a standard search warrant:

8.   Since the Commission issued its Formal Order on October 17, 2002, the Commission's staff has taken investigative testimony from 57 witnesses, for 105 days of testimony. The testimony has been taken throughout the United States.

9.   The Commission's staff has scheduled the investigative testimony of additional witnesses.

10.  Since the Commission issued its Formal Order on October 17, 2002, the Commission's staff

has issued regulatory requests to brokerage firms for brokerage account information.

11.  Since the Commission issued its Formal Order on October 17, 2002, the Commission's staff has issued over one hundred subpoenas for the production of documents. Pursuant to the subpoenas for the production of documents, the staff has received substantial document productions in response to the subpoenas.

12.  On January 7, 1998, Henry Yuen entered into an Amended and Restated Employment Agreement ("Yuen's Employment Agreement") with Gemstar International Group, Ltd. and Gemstar Development Corp. (collectively with Gemstar-TV Guide International, Inc., "Gemstar"), a copy of which is attached hereto as Exhibit 2.

13.  Under Yuen's Employment Agreement, Yuen's initial base salary was $1 million, subject to annual increases that were based on Gemstar's reported financial results. *See* Exhibit 2 at § 3(a).

14.  Yuen's Employment Agreement contained a formula under which Yuen's base salary could increase each year, depending upon annual percentage increases in Gemstar's consolidated revenues and consolidated net earnings, as reported in Gemstar's financial statements. *Id.*

15.  Yuen's Employment Agreement contained a provision for an annual merit bonus that was calculated using Gemstar's reported financial results. The formula used his adjusted base salary and the annual percentage increase, if any,

in Gemstar's consolidated earnings before interest, taxes, depreciation and amortization ("EBITDA"). Yuen could elect to receive his merit bonus in the form of cash or stock options. *Id.* at § 3(b).

16. Yuen's Employment Agreement also included a provision for an annual incentive bonus that was calculated using Gemstar's reported financial results. The formula used his adjusted base salary and increases in Gemstar's consolidated earnings per share as reported in Gemstar's Forms 10-Q and 10-K. Yuen could elect to receive his annual incentive bonus in the form of cash or stock options. *Id.* at § 3(c) & Schedule I.

17. Yuen's Employment Agreement provided Yuen with annual stock options. *Id.* at § 3(d).

18. During the investigation, the staff took Yuen's testimony on April 1, 2003, when he answered general background questions. The staff did not inquire into specific transactions in any detail. Yuen appeared again to provide testimony on April 23, 2003, at which time Yuen asserted his Fifth Amendment privilege against self-incrimination in response to all questions.

19. I have examined Forms W-2 issued to Yuen by Gemstar from 1999 through 2002, and have added the amounts of compensation reported on the Forms W-2 for those four years, which totals $37,849,002.35. The staff understands that this includes salary and wages, as well as monies related to the exercise of stock options.

20. The staff has analyzed brokerage records from Yuen's brokerage firm, including a "Master

Agreement" dated March 27, 2002, and confirmations of transactions executed under that agreement. The brokerage records show that between April 3, 2002 and April 8, 2002, Yuen entered into "prepaid forward" transactions to dispose of 7 million shares of Gemstar stock. The brokerage records show that Yuen received an initial payment from the disposition of these 7 million shares of approximately $59 million.

21. A copy of Gemstar's press release, dated October 8, 2001, entitled *Gemstar-TV Guide International, Inc. CEO and CFO Exercise Options to Acquire and Hold Shares*, is attached hereto as Exhibit 3.

22. *On March 31, 1998, Elsie Leung entered into an Amended and Restated Employment Agreement with Gemstar International Group, Ltd. and Gemstar Development Corp. ("Leung's Employment Agreement"), a copy of which is attached hereto as Exhibit 4.*

23. Under Leung's Employment Agreement, her initial base salary was $700,000, subject to annual increases based on Gemstar's financial results. *Id.* at § 3(a).

24. Leung's Employment Agreement included a formula to calculate annual increases in her base salary, which used annual percentage increases in Gemstar's consolidated revenues and consolidated net earnings as shown in Gemstar's financial statements. *Id.*

25. Leung's Employment Agreement included a provision for an annual incentive bonus based

upon Gemstar's financial results. The formula for calculating Leung's incentive bonus used her adjusted base salary and increases in Gemstar's consolidated earnings per share as reported in Gemstar's Forms 10-Q and 10-K. *Id.* at § 3(b) & Schedule I.

26. Leung's Employment Agreement further provided Leung with annual stock options. *Id.* at § 3(c).

27. I have examined Forms W-2 issued to Leung by Gemstar from 1999 through 2002, and have added the amounts of compensation reported on the Forms W-2 for those four years, which totals $11,180,561.28.

\* \* \*

39. On May 2, 2003, the staff provided notice to counsel for Gemstar, pursuant to Local Rule 7-19.1, that the Commission had authorized the staff to file an Application under Section 1103 of Sarbanes-Oxley Act of 2002 to seek a temporary order requiring Gemstar to escrow any extraordinary payments to its employees. The staff informed counsel for Gemstar that the Commission intended to file the Application on May 5, 2003, as early in the morning as possible.

(emphasis added). As attachments to this application, the Commission included numerous press releases issued by Gemstar and excerpts from its 8-K and 10-K reports highlighting the tumult inside the company surrounding management changes and the restatement of financial results.

In a supplemental memorandum in support of its application for a temporary order, the Commission made a compel-

ling case that the payments at issue were not regular payments in the everyday operation or normal management of Gemstar. In many instances, the Commission simply pointed out what Yuen and Leung normally would have been entitled to, and then highlighted the differences arising from the Termination Agreements, notable differences that were not usual and not ordinary, and thus "extraordinary." We highlight and quote from the memorandum:

## I.  *INTRODUCTION*

The Securities and Exchange Commission ("Commission") seeks a temporary order preventing Gemstar-TV Guide International, Inc., (Gemstar") [sic] from making any extraordinary payments to certain persons for a period of 45 days, under Section 1103 of the Sarbanes-Oxley Act of 2002. Respondent Gemstar does not oppose entry of an order maintaining the status quo. Intervenors Henry C. Yuen and Elsie Leung (collectively "Intervenors") oppose such an order because they contend: (1) they should be heard before any order is entered; (2) there is no reason to enter the order on an expedited basis; (3) the payments are not extraordinary under Section 1103; and (4) Section 1103 is unconstitutional.

## II.  *ARGUMENT*

### A.  *The Restructuring Payments are Extraordinary Payments under Section 1103*

The principal issue is whether the Restructuring Payments of $37.64 million in cash are extraordinary payments under Section 1103. Yuen and Leung admit that the *payments are being made pursuant to their November 7, 2002 "Termination Agreements" with Gemstar that were the subject of at least five*

*months of extended negotiation and approval by Gemstar's entire Board of Directors*. (Yuen Memo at p. 9.) Yuen and Leung also admit that the Restructuring Payments were made to effect their removal as Chief Executive Officer and Chief Financial Officer, respectively, and to remove control of Gemstar's Board of Directors from Yuen. *The Restructuring Payments and their circumstances are so extraordinary that Yuen asserted his Fifth Amendment privilege to all questions about his compensation during testimony on April 25, 2003*. Under these circumstances, the Restructuring Payments are extraordinary payments.

Yuen and Leung ignore the significant events that are the basis for the Restructuring Payments, and focus only on the components which they characterize as ordinary payments made under "long standing contractual commitments." (*Id.* p. 8.) However, the operative agreements under which the Restructuring Payments are being made are the November 7, 2002 Termination Agreements, entered into on the same day that the payments originally were to be disbursed by Gemstar. *The Restructuring Payments are being made pursuant to the Termination Agreements, which by their terms supersede all other agreements between the parties. The restructuring was so significant that Gemstar issued a press release announcing it on October 8, 2002, and filed a Form 8-K on November 7, 2002.*

Yuen and Leung also ignore that, *in terms of relationship to annual compensation*, the Restructuring Payments are extraordinary. Yuen is to receive a total of $56.7 million in cash and stock, of which $29.48 million is cash. *This is more than five times Yuen's 2001 base salary of approximately $5 million a year*. Leung is to receive $14.4 million in cash and

stock, of which $8.16 million is cash. *Similarly, this is more than six times Leung's 2001 base salary of $1.3 million.*

*There can be little dispute that the Restructuring Payments are not being made in a normal and usual course of business, but rather are "for an exceptional purpose or a special occasion." Black's Law Dictionary*, at p. 406 (Abridged Sixth Edition 1991). Indeed, if there were nothing remarkable about these payments, then Yuen could have testified freely about them on April 25, 2003; instead, *he invoked his Fifth Amendment privilege against self-incrimination with respect to all questions about his compensation.*

B.  *The Component Amounts Are Extraordinary Payments Under Section 1103*

Yuen and Leung misdirect the Court away from the events and circumstances of the Restructuring Payments and the total $37.64 million in cash, and focus instead on alleged components of the Restructuring Payments, which they identify as: (1) termination fees or severance payments; (2) accrued unpaid bonuses for 2001; (3) accrued unpaid salary; and (4) accrued unused vacation pay.

*However, the Termination Agreements do not describe the Restructuring Payments as having the same components Yuen and Leung now advance to the Court*: Yuen's Termination Agreement describes the payments as: "(I) a termination fee of $22,452,640 and (ii) $7,030,778 (in *full and complete settlement* for all unpaid salary, bonuses and unused vacation days due under the Current Employment Agreement *or otherwise*)." Leung's is similar. The Termination Agreements state that the single

lump sum payments are a "settlement" of amounts due or "otherwise," and not merely simple contractual payments due in the ordinary course. The description in the Termination Agreements is consistent with Intervenors' admission that the Restructuring Payments were the subject of "extended" negotiations, and that *component amounts that make up the lump sum settlement payments in the Termination Agreements are largely different than amounts due under their employment agreements.*

Yuen's and Leung's argument that the Court should look at each component in isolation, and not in context of the events and the governing documents, should be rejected. Under their argument, an extraordinary payment would escape Section 1103 if made up of components that can be characterized as usual or ordinary. Thus, if the Court finds that the "vacation pay" component is not extraordinary, then in the future an issuer and its employees will simply call suspect extraordinary payments "vacation pay" to evade the statute. Section 1103 should not be read in a restrictive manner that would render it meaningless, but rather it should be read broadly to effect the remedial purposes of the federal securities laws. *See, e.g., SEC v. Zandford*, 535 U.S. 813, 122 S. Ct. 1899, 153 L.Ed.2d 1 (2002).

1.  *The   termination   fees   are   extraordinary payments*

Yuen and Leung admit that the bulk of the funds are a termination fee or severance payment, but do not provide any specific arguments why these are not extraordinary payments under Section 1103. *Yuen and Leung admit that the amount of termination fees were negotiated, and are substantially different than the severance payments they may have been entitled*

*to under their existing employment agreements.* The Termination Agreements provide that Yuen is to receive a "termination fee" of $22.45 million, and Leung a "termination fee" of $6,957,953.

The "termination fees" are the amounts agreed to, after extended negotiation between Gemstar, Yuen, and Leung, as the amounts Gemstar must pay to terminate Yuen and Leung. *Generally, the termination of a chief executive officer or chief financial officer is an extraordinary event, usually accompanied by a public announcement and a Form 8-K filing, as it was here.*

## 2.   *The accrued unpaid bonuses for 2001*

Bonuses are clearly the type of extraordinary payments encompassed by Section 1103. By definition, a bonus is not an ordinary and usual payment, but rather a "consideration or premium paid in addition to what is strictly due" and a "premium or extra or irregular remuneration." As Senator Lott commented about Section 1103: "While an investigation is underway, basically rewards were given to these corporate executives." *Any common sense interpretation of a bonus understands that it is a special reward for meeting or surpassing goals.*

Yuen and Leung's 2001 bonuses are exactly the type of payments that should be frozen: their bonuses are rewards for Gemstar's 2001 reported financial results. The Commission is investigating whether Gemstar's 2001 financial results were fraudulently overstated. Since Yuen and Leung (and others) signed and filed Gemstar's 2001 Form 10-K on April 1, 2002, Gemstar has restated and reversed substantial revenue items contained in the 2001 Form 10-K. *The very set of events Section 1103 was*

*designed to prevent is implicated by the bonus payments: while the Commission is attempting to determine whether Gemstar's 2001 financial results were overstated and fraudulent, Yuen and Leung are demanding to be paid for those results.*

*Under their employment agreements, the calculation of Yuen and Leung's bonuses is tied directly to Gemstar's reported financial results.* Yuen's "merit bonus" is calculated using his adjusted base salary and Gemstar's percentage increase in EBITDA (earnings before interest, taxes, depreciation, and amortization). Yuen and Leung each had an identical provision in their employment agreements for an "incentive bonus," calculated based on Gemstar's reported financial results.

3.  *The accrued unpaid salary*

The unpaid salary component of the settlement amount is, like the bonus payment component, directly dependent upon Gemstar's reported 2001 financial statements that are under investigation by the Commission. *Yuen and Leung's employment agreements included a formula for the annual adjustment of their base salary. Under that formula, if consolidated revenues or consolidated net earnings increase, then Yuen and Leung's base salary is increased by a proportional amount.* (*Id.*, Ex 2, at 18 (Yuen Employment Agreement, ¶ 3(a)); Ex. 4, at 55 (Leung Employment Agreement ¶ 3(a)).

*The calculation of the "catch-up" salary based upon allegedly fraudulent financial statements is, again, exactly the type of "reward" about which Section 1103 is concerned.* Gemstar has restated hundreds of millions of dollars of revenues from multiple transactions since Yuen and Leung entered

into the Termination Agreements. *To the extent Gemstar's reported financial results have been overstated for a number of years (as indicated by the restatements), Yuen and Leung's compensation and bonuses are terminally infected with those overstatements.*

4.    *The accrued unused vacation pay*

*The extraordinary nature of the vacation pay amount in the settlement is revealed by the context.* In the ordinary course, an employee would take their vacation time during a year and receive their salary while on vacation. The employee is paid accrued but unused vacation pay only on a special occasion — when their employment is terminated. [Sic] *But for the restructuring and their removal, Yuen and Leung had no contractual rights, under their employment agreements, to be paid for accrued but unused vacation.*

(emphasis added).

## V

The district court's escrow order is reviewed for abuse of discretion. *See United States v. Cal-Almond, Inc.*, 102 F.3d 999, 1002-03 (9th Cir. 1996) (analogizing escrow order to preliminary injunction and applying abuse of discretion standard). The district court abuses its discretion when it applies incorrect legal standards or makes clearly erroneous findings of fact. *Id.* at 1003. The district court's interpretation and construction of a federal statute are questions of law reviewed de novo. *SEC v. McCarthy*, 322 F.3d 650, 654 (9th Cir. 2003).

## VI

[1] We decide the issues in this case in a distinctive statutory context. We explained this context in *SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993):

When the Commission sues to enforce the securities laws, it vindicates public rights and furthers the public interest. The public character of Commission action is reflected in the introduction to the 1934 Act: "[T]ransactions in securities . . . are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions." 15 U.S.C. § 78b. Congress entrusted the Commission with the vital mission of ensuring the honesty and fairness of the capital markets. "The entire purpose and thrust of a [Commission] enforcement action is to expeditiously safeguard the public interest by enjoining securities violations. The claims asserted in such an action stem from, and are colored by, the intense public interest in [Commission] enforcement of these laws." *SEC v. Asset Management Corp.*, 456 F. Supp. 998, 1000 (S.D. Ind. 1978).

[2] Given this context and the narrowly defined, regulated, and targeted area to which it applies, we conclude that Congress' use of the term "extraordinary" in Section 1103 in connection with payments being made by a company to insiders during an investigation for potential securities fraud — read in the light of the remedial purposes of federal securities laws — does not constitute a legal or a constitutional infirmity. "Extraordinary" means, in plain language, out of the ordinary. In the context of a statute aimed at preventing the raiding of corporate assets, "out of the ordinary" means a payment that would not typically be made by a company in its customary course of business.[2] The standard of comparison is the compa-

---

[2]We have taken a similar approach in interpreting the analogous phrase "extraordinary expenses." *See*, *e.g.*, *Atlanta-One, Inc. v. SEC*, 100 F.3d 105, 107-108 (9th Cir. 1996) (noting that "extraordinary expenses" of a business could not justify very high commission fees); *In re United States Trustee*, 32 F.3d 1370, 1374 (9th Cir. 1994) (noting that, for reimbursing a trustee in bankruptcy, the "extraordinary expenses" are those "associated

ny's common or regular behavior. Thus, the determination of whether a payment is extraordinary will be a fact-based and flexible inquiry. Context-specific factors such as the circumstances under which the payment is contemplated or made, the purpose of the payment, and the size of the payment may inform whether a payment is extraordinary, as the district court properly noted in this case. For example, a payment made by a company that would otherwise be unremarkable may be rendered extraordinary by unusual circumstances. *See* BLACK'S LAW DICTIONARY 586 (6th ed. 1990) (defining "extraordinary" as "[o]ut of the ordinary; . . . employed for an exceptional purpose or on a special occasion").

A nexus between the suspected wrongdoing and the payment itself may further demonstrate that the payment is extraordinary, although such a connection is not required. Evidence of the company's deviation from an "industry standard" — or the practice of similarly situated businesses — also might reveal whether a payment is extraordinary. Again, however, the statute does not compel any specific method of making the determination but allows for the consideration of a variety of factors, as the situation may warrant.

**[3]** The district court had it exactly right in reading this statute, " 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' " *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963)). The court avoided any "one litmus test" and instead looked *in context* at (1) the circumstances of the payment, (2) the purpose of the payment, and (3) the size of the payment. The court concluded in a

with the *special needs* of an individual case."); *Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters*, 623 F.2d 1354, 1365 n.11 (9th Cir. 1980) ("In addition to lost profits, an injured employer is entitled to recover the extraordinary expenses, not normal *to its business operation*, incurred as a result of the Union's illegal strike.") (emphasis added).

thorough, thoughtful, and well-reasoned decision that the Commission "has met its burden" "under almost any standard."

[4] The court correctly focused on the nature, purpose, and circumstances of the payments and determined that they had nothing to do with Gemstar's ordinary business. The court accurately observed that

> [t]he payments were negotiated over a five month period and involved the participation of the Gemstar Board, a Special Committee, and outside consultants. The Board, the Special Committee, and the Intervenors Yuen and Leung were each represented by separate sets of counsel. Additionally, the termination agreements were executed as part of the process of removing both Leung and Yuen from their positions as Gemstar Officers.

The court concluded that the termination agreements and the disputed payments "are anything but ordinary." We agree. Using as a measure what ordinarily goes on in the process of the issuer's business, these facts are clearly unusual and extraordinary. As the Commission's supplemental memorandum points out, the negotiated Termination Agreement payments here are five and six times greater than Yuen's and Leung's base salary, the component amounts that make up the lump sum payments are different than the amounts due under their employment agreements, the termination fees are different from what they may have been entitled to under existing agreements, the bonuses appear to be fruit of the alleged fraudulent financial results, and the vacation pay item did not exist under their contracts. One would not expect benefits like these to be flowing from corporate assets to executives resigning under fire from key management positions. This scenario is not business as usual. Telling also is the glaring fact that CEO Yuen would not discuss these matters with the Commission, choosing instead to assert his Fifth Amendment privi-

lege. *See SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) ("Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof.").

[5] Finally, we discern — as did the district court — that a nexus between the alleged wrongdoing and the contemplated payments was apparent from the Commission's submissions. As the district court said, "the bonuses are keyed to Gemstar's financial performance — the accuracy of which is alleged to have been compromised by the Intervenors."

We believe, as did the district court, that Gemstar's execution of *its* overall business objectives and ordinary management of *its* business operations did not entail terminating its CEO and CFO in the shadow of misstated revenues, misleading public statements, securities fraud investigations, plunging stock prices, and public relations debacles, not to mention Yuen's and Leung's inability to certify Gemstar's books as accurate. Gemstar's Form 8-K filings certainly raise red flags the SEC would be remiss to ignore.

The dissent suggests that to establish what is "extraordinary," the government must offer evidence of what constitutes "usual or ordinary payments to a CEO and a CFO under same or similar circumstances," i.e., payments contemplated under threat of delisting, in a fight with its independent auditor; and during an investigation for having misstated revenues, cooked the books, defrauded investors, employees and the market, and possibly committed a basket full of crimes. We respectfully disagree. The idea that a court needs somehow to have evidence of a "norm for corporate decision-making *of this type*," i.e., rampant fraud and a world of trouble, is off the mark. Odd it would be indeed to shield payments from escrow simply because an ousted insider at some other corporation has been similarly enriched. In some cases, it might be probative to look to a broader norm, but not here. Legal "probable cause" statements, of which this is a variant, do not need

information about how normal people act to create a reasonable suspicion with respect to the targeted suspects. *See Go Leasing, Inc. v. NTSB*, 800 F.2d 1514, 1518 (9th Cir. 1986) ("Agencies charged with a prosecutorial function must have flexibility in confronting the varieties of facts presented in particular cases.").

These insiders appear, from the record submitted to the district court, to be part of an enterprise engaged in cookie jar mismanagement. The Commission subsequently sued them for multiple securities fraud violations, seeking anti-fraud injunctions, civil money penalties, and disgorgement of ill-gotten gains, including salaries, bonuses, and proceeds from the sale of stock — each one of which is at the epicenter of the payments at issue. The Commission's complaint alleges that because their compensation was linked to Gemstar's reported financial results, Yuen and Leung reaped millions of dollars in financial gains — in excess salary, bonuses, and options — from their fraudulent manipulations of Gemstar's revenues, to the tune of an overstatement of those revenues by at least $223 million.

Congress designed Section 1103 to add necessary teeth to the Commission's ability to perform its mission. It ensures that recovery by way of disgorgement, etc., is effective rather than empty. As for the importance of disgorgement, we have said:

> Disgorgement plays a central role in the enforcement of the securities laws. The effective enforcement of the federal securities laws requires that the Commission be able to make violations unprofitable. The deterrent effect of a Commission enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits. By deterring violations of the securities laws, disgorgement actions further the Commission's public policy mission of protecting investors and safeguarding

the integrity of the markets. Although the Commission at times may use the disgorged proceeds to compensate injured victims, this does not detract from the public nature of Commission enforcement actions: the touchstone remains the fact that public policies are served and the public interest is advanced by the litigation.

*Rind*, 991 F.2d at 1491-92 (citations, internal quotations, and alterations omitted).

## VII

Having concluded that Gemstar's payments to Yuen and Leung constitute "extraordinary payments" within the meaning of Section 1103, we turn to the Appellants' argument that Section 1103 is unconstitutionally vague. Our analysis must begin with a presumption in favor of the constitutionality of an act of Congress. *Parker v. Levy*, 417 U.S. 733, 757 (1974). With this principle in mind, we conclude (1) that Section 1103 is not void for vagueness as applied to Yuen or Leung, and (2) that because Section 1103 does not concern First Amendment issues, Yuen and Leung's facial challenge fails as well. *See United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.").

**[6]** As the SEC points out, statutes that regulate businesses do not require the same precision as statutes addressing constitutional and criminal issues. In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), the Supreme Court held:

[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face

economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

*Id.* at 498 (footnotes omitted); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) ("In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed."); *Botosan v. Paul McNally Realty*, 216 F.3d 827, 836 (9th Cir. 2000) ("Because the ADA is a statute that regulates commercial conduct, it is reviewed under a less stringent standard of specificity."). Under this less stringent standard, the Appellants' void for vagueness argument lacks merit. A statute is unconstitutionally vague if it fails one of two tests: "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Yuen and Leung cannot show that Section 1103 fails either test.

## VIII

We conclude that the district court was correct in its understanding of the meaning of "extraordinary payments" and in the application of that flexible standard to the facts and circumstances of this case. Wisely, we believe, both Congress and the SEC have avoided creating a specific litmus test that determines what is or is not an "extraordinary payment." To do so for all possible situations would be next to impossible and would serve only to guide corporate scoundrels searching for ways to circumvent this salutary law.

AFFIRMED.

REINHARDT, Circuit Judge, concurring in the result, with whom GRABER, Circuit Judge, joins:

I agree that the severance packages in question are "extraordinary payments." I do not believe, however, that Congress intended courts to apply a vague and multi-faceted test that requires consideration of the purpose, circumstances, and size of the benefits, as well as other more complex factors, when determining whether to grant a temporary order escrowing such one-time payments for a short period of time while the SEC makes its decision regarding the filing of formal charges. Rather, employing a well-established meaning of the word "extraordinary," I would hold that *all* severance packages due top corporate officers and officials, and any other substantial non-routine payments to which they may be entitled, constitute "extraordinary payments" that the district court may order placed in escrow temporarily.

Section 1103 is a prophylactic provision intended to maintain the financial status quo of companies under investigation. As Senator Lott, sponsor of the provision, explained, its purpose is to "freeze[ ] payments of potential wrongdoers . . . [by] imposing a 45-day freeze on extraordinary payments to corporate executives." Floor Statement of then Senate Majority Leader Lott, 148 Cong. Rec. S6545 (July 10, 2002) (emphasis added). In order to effectuate the broad remedial purpose of the Sarbanes-Oxley Act, section 1103 authorizes the SEC to freeze any payments that are not made in the course of ordinary business operations and that might adversely affect the SEC's ability to protect the shareholders of a company under investigation. The freeze is intended to ensure that disgorgement and other remedies will be available should corporate financial wrongdoing be established. Complementing section 1103's "freezing" of certain funds of a company under investigation, the "extraordinariness" requirement ensures that individuals will continue to receive their regular salaries and benefits and that the company will not be restricted in its usual and ordinary day-to-day operations dur-

ing the pendency of the investigation. In contrast, the severance of a corporate executive, such as a CEO or a CFO, and the payment of benefits related to that severance, is, by definition, "extraordinary": it is uncommon, unusual, and, ultimately, not a part of the regular day-to-day business of the company.[1]

This interpretation of section 1103 is well-supported. It accords with a common and well-established definition of "extraordinary." *See e.g.*, Black's Law Dictionary 406 (6th ed. (abridged) 1991) (defining "extraordinary," *inter alia*, as "employed for an exceptional purpose or on a special occasion"); Oxford English Dictionary (2d. ed. 1989) (defining "extraordinary," *inter alia*, as being "[o]ut of the usual or regular course of order . . . exceptional; unusual; singular."). It is corroborated by the Congressional record. *See, e.g.*, Floor Statement of Senator Lott, 148 Cong. Rec. S6545 (daily ed. July 10, 2002) (complaining that executives were receiving "rewards," "corporate assets . . . [for] personal benefit," and "increased payments," "[w]hile an SEC investigation is underway"); Floor Statement of Representative Sensenbrenner 148 Cong. Rec. H4685 (daily ed. July 16, 2002) (stating that under this legislation, "top executives will not be allowed to pilfer the assets of the company by giving themselves huge bonuses and other extraordinary payments if the company is subject to [an] SEC investigation. Their pay and benefits are frozen when the investigation starts").[2] Lastly, a bright-line rule comports with the purpose of the Act, particularly in light

---

[1]As Judge Trott's opinion for the court points out, *see ante* at 3397-98, we have recently experienced a tidal wave of corporate accounting scandals. Although the government tends, unabashedly, to give medals to high-ranking officials whose missions have ended in disaster, corporations are more likely to give extravagant bonuses to such individuals, while inviting them to leave so as to avoid further public embarrassment.

[2]As the above statements from Congress illustrate, Congress referred to "bonuses," "rewards," and "increased payments," as "extraordinary payments." All are payments beyond a corporate executive's ordinary and customary salary or other compensation.

of the early stage of the investigation at which the SEC would ordinarily need to invoke section 1103, a stage at which the agency is yet to develop much of the relevant information. *See* Floor Statement of Representative Baker, 148 Cong. Rec. H4683-01 (daily ed. July 16, 2002) (noting that section 1103 allows "the SEC to freeze extraordinary payments *until* appropriate investigation may be concluded to determine whether such payments were warranted or not." (emphasis added)). As the SEC puts it, "complex proceedings are inimical . . . to the purposes of Section 1103" when the "investigation remains nascent or incomplete, and on an expedited (often emergency) basis."[3]

Irrespective of how common the termination of a CEO, CFO, or any key employee may be in the business world at large, or even at the particular company under investigation, the termination itself, and more important, the substantial severance package that so frequently accompanies it, *is* "extraordinary" under section 1103, because the event is not part of the regular day-to-day operations of the enterprise and the payments tend to disturb the financial status quo that the SEC is seeking to maintain. I see no need to weigh the amount of the severance package relative to the petitioners' base salary, or to assess whether the severance negotiations were suspicious or carried out in an "extraordinary" manner; nor do I see any need to examine any of the other factors the majority suggests may in some circumstances be relevant, such as the severance benefits of officers of other companies. Like the majority, I believe that Congress intended to "provide a strong shield for third-party creditors and corporate investors once the SEC begins an investigation of corporate malfeasance," *ante* at 3399. Contrary to the majority, however, I believe that whether there are suspicions of additional wrongdoing in the negotiation of the severance package, and whether the SEC can prove that any severance payments are connected with the pending investigation, is irrelevant to the question whether

---

[3]Petition of the SEC for Rehearing and Rehearing En Banc, at 15.

severance payments are "extraordinary" under the Act. If the purpose of section 1103 is, as the majority agrees, to prevent wrongdoers from depleting the corporate treasury and to ensure that there are adequate funds to provide for disgorgement should the allegations of fraud prove to be true, then an "extraordinary" payment would still be extraordinary even though it simply matched the executive's base annual salary, which in most cases would be in the millions. Similarly, the payment would be extraordinary even though the terms and amount were established entirely and unambiguously by pre-negotiated provisions incorporated in an employment contract long before the investigation commenced and even though no further negotiations whatsoever transpired after the first hint of scandal. In short a severance payment is an extraordinary payment regardless of the circumstances.

Of course, just because all severance payments are extraordinary does not mean that all such payments will be automatically frozen when an investigation starts. Indeed, the SEC has the discretion to decide whether a particular extraordinary payment should be placed in escrow, and whether to request an escrow order from a federal judge. In making that decision it will undoubtedly consider whether, on the basis of the limited facts available to it, a particular freeze order is necessary or desirable to protect the public interest. Also, if, ultimately, the investigation does not lead to a charge by the SEC, any escrowed payment is released, while if a charge against the company is filed, the individual affected by such a freeze may petition a federal court for review of the order.

The clear-cut rule established by section 1103 provides an orderly and efficient method of effectuating Congress' intent while giving firm guidance to companies that are under investigation. The risk that in the absence of a freeze the SEC will be unable to achieve its objective of protecting the public interest because it cannot recoup the extraordinary payments made to high-ranking corporate officers or officials substantially outweighs the limited inconvenience a temporary freeze

imposes upon the issuer and the would-be recipient of the extraordinary payment. In my opinion, Congress did not intend that before the SEC may freeze a severance payment for 45 or 90 days, it must satisfy the "extraordinariness" standard by presenting a substantial body of evidence to a court regarding the purpose, circumstances, and size of the particular payment. I would hold that under section 1103, all severance packages due to corporate executives fall into the category of "extraordinary payments" and are subject to a temporary freeze when the company in question, or those acting on its behalf, are under investigation for serious securities violations. For this reason, I agree that the order freezing the severance payments of Yuen and Leung must be affirmed.

---

BEA, Circuit Judge, dissenting:

We are called upon to interpret the phrase "extraordinary payments" found in Section 1103 of the Sarbanes-Oxley Act. 15 U.S.C. § 78u-3(c)(3)(A)(i). In my view, the majority errs in two regards.

*First*, the majority interprets "extraordinary payments" to mean "payments under extraordinary circumstances." *See* Maj. Op. at 3417-20. This first step enables the majority to take account of a variety of circumstances (such as the fact that the payments at issue were made "in the shadow" of conduct ultimately giving rise to the SEC's investigation) that are only indirectly related (or, in some cases, not related at all) to the payments at issue. *See id.* at 3419-20. Of course, it is perfectly proper for the SEC to consider such circumstances in deciding whether to initiate an investigation regarding possible violations of the federal securities laws. But by also conscripting these and similar circumstances to render payments "extraordinary," the majority violates basic canons of statutory construction, rewriting the statute and, in so doing, rendering the very term at issue surplusage.

*Second*, by establishing as the principally relevant standard whether the circumstances surrounding the payments at issue are "extraordinary" not for other companies, but for the company making the payments, *any* payment made under *any* situation novel to *that* company is now subject to escrow. Thus, the first time a company under SEC investigation gives a departing executive not a golden parachute, but a mere gold watch (or, even, a gold-plated watch), escrow will be available to the SEC. This alone renders the majority's standard unworkable. But the majority then exacerbates the problem by conceding that comparison to the industry or other companies may also be relevant in some circumstances, thereby creating a second standard but without providing any guidance as to when each of these potentially conflicting standards applies.

Reading the statute as it is written rather than as some may wish it had been written and applying what is a workable standard, I continue to believe the SEC must present evidence that a payment was extraordinary relative to payments made by other comparable companies, under circumstances which have not resulted in an investigation by securities agencies, but which are otherwise comparable. Because the SEC presented no such evidence, I would vacate the district court's order and remand to permit the SEC the opportunity to present appropriate evidence. Accordingly, I respectfully dissent.

I.

Before I address what I regard as the majority's two errors in interpreting the statute, it is important to set the record straight as to what is at stake. The majority describes the escrow as "nothing more onerous than a temporary order requiring the issuer under scrutiny to escrow those intended payments to a clearly defined group of insiders for no more than 45 days in a very familiar device, an interest-bearing account — all of this subject to court supervision." Maj. Op. at 3396-97. This is, at best, a naive view — blinkered from what can and did happen in this case. Once the subject of an

investigation is charged with a securities violation by the commencement of a civil action, "the [escrow] order shall remain in effect, subject to court approval, *until the conclusion of any legal proceedings related thereto . . . .*" 15 U.S.C. § 78u-3(c)(3)(B)(i) (emphasis added). Here, the district court's initial escrow order was effective as of May 9, 2003. Nearly two years have passed, and Yuen's and Leung's payments remain in escrow.

## II.

Section 1103 provides in relevant part:

> Whenever, during the course of a lawful investigation involving possible violations of the Federal securities laws by an issuer of publicly traded securities or any of its directors, officers, partners, controlling persons, agents, or employees, it shall appear to the Commission that it is likely that the issuer will make *extraordinary payments* (whether compensation or otherwise) to any of the foregoing persons, the Commission may petition a Federal district court for a temporary order requiring the issuer to escrow, subject to court supervision, those payments in an interest-bearing account for 45 days.

15 U.S.C. § 78u-3(c)(3)(A)(i) (emphasis added). Congress did not define "extraordinary payments."[1] Nor has the SEC promulgated regulations doing so, although it is empowered to

---

[1]When Congress wants to "cap" termination payments, it certainly knows how to do it with unquestionable precision. *See*, *e.g.*, 11 U.S.C. § 502(b)(7) (capping an employee's claim for damages resulting from the termination of an employment agreement when the employer has filed for bankruptcy to (1) one year's compensation provided by such contract measured from the earlier of the date of the filing of the bankruptcy petition or the date of termination, plus (2) any unpaid compensation due under such contract owing on such date).

adopt regulations for the implementation of the Sarbanes-Oxley Act. 15 U.S.C. § 78w(a)(1).

Thus, purporting to rely on the statute's "plain language," Maj. Op. at 3417, but presumably influenced by what it perceives to have been Congress' intent in enacting Section 1103, *id.* at 3397-99, the majority defines "extraordinary payments" as those "that would not typically be made by a company in its customary course of business." *Id.* at 3417. Continuing, the majority explains that "[c]ontext-specific factors *such as the circumstances under which the payment is contemplated or made . . .* may inform whether a payment is extraordinary" — indeed, that "*a payment made by a company that would otherwise be unremarkable may be rendered extraordinary by unusual circumstances*" — and, thus, that the district court correctly focused not only on the size of the payment, but also on "the circumstances of the payment" and "the purpose of the payment." *Id.* at 3417-18 (emphasis added); *accord id.* at 3419 ("The court correctly focused on the nature, purpose, and circumstances of the payments . . . ."). Finally, in affirming the district court's order, the majority concludes:

> We believe, as did the district court, that Gemstar's execution of *its* overall business objectives and ordinary management of *its* business operations did not entail terminating its CEO and CFO in the shadow of misstated revenues, misleading public statements, securities fraud investigations, plunging stock prices, and public relations debacles, not to mention Yuen's and Leung's inability to certify Gemstar's books as accurate. Gemstar's Form 8-K filings certainly raise red flags the SEC would be remiss to ignore.

*Id.* at 3420 (emphasis in original); *accord id.* at 3419 ("Using as a measure what ordinarily goes on in the process of the issuer's business, these facts are clearly unusual and extraordinary.").

In so interpreting the statute, the majority errs in two regards.

### A.

*First*, the majority's interpretation violates basic canons of statutory construction. To begin, the majority has not so much interpreted the statute as it has rewritten it. As explained above, the majority's interpretation of "extraordinary payments" amounts to "payments under extraordinary circumstances." *See* Maj. Op. at 3417-20. Indeed, the majority itself explains that "a payment made by a company that would otherwise be unremarkable may be rendered extraordinary by unusual circumstances." *Id.* at 3418. Thus, under the majority's interpretation, *any* payment following "extraordinary circumstances" may be subject to escrow. Yuen and Leung could have been paid $1 or $1 billion — it would make no difference to the majority.

But this simply is not what the statute says. As the statute is written, "extraordinary" modifies "payments"; as the majority has rewritten it, "extraordinary" modifies the circumstances under which the payments were made. To put it bluntly, where in the statute is the word "circumstances"? Moreover, the majority has not only inserted words into the statute, it has rearranged the remainder of it. This we cannot do, even for the laudable purpose of giving effect to important public interests:

> Our concern for the protective purposes of remedial legislation . . . does not vest this court with a license to rewrite the statute, for "our problem is to construe what Congress has written. After all, Congress expresses its purpose by words. *It is for us to ascertain — neither to add nor to subtract, neither to delete nor distort*." *62 Cases, More or Less, Each Containing Six Jars of Jam* v. *United States*, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566

(1951). "Our compass is not to read a statute to reach what we perceive — or even what we think a reasonable person should perceive — is a 'sensible result'; *Congress must be taken at its word unless we are to assume the role of statute revisers*." *Bifulco* v. *United States*, 447 U.S. 381, 401, 100 S.Ct. 2247, 2259, 65 L.Ed.2d 205 (1980).

*United States* v. *Smith*, 740 F.2d 734, 738 (9th Cir. 1984) (emphasis added) (internal parentheticals omitted); *see also Xi* v. *INS*, 298 F.3d 832, 839 (9th Cir. 2002) ("[A] decision to rearrange or rewrite the statute falls within the legislative, not the judicial, prerogative."); *Lewis* v. *McAdam*, 762 F.2d 800, 804 (9th Cir. 1985) ("We have no constitutional authority to rewrite a [securities] statute simply because we may determine that it is susceptible of improvement.") (citing *Badaracco* v. *Commissioner*, 464 U.S. 386, 398 (1984)).

Further, given the circumstances the majority finds relevant, the majority's interpretation renders "extraordinary" surplusage. According to the majority, that the payments here were made "in the shadow of misstated revenues, misleading public statements, securities fraud investigations, plunging stock prices, and public relations debacles," "Yuen's and Leung's inability to certify Gemstar's books as accurate[,] [and] Gemstar's Form 8-K filings" are all indicia that the payments here were "extraordinary" — or, more accurately, made under extraordinary circumstances. Maj. Op. at 3420.

Some of these factors are certain to be present any time the SEC investigates a company for possible violations of the federal securities laws, and the rest are likely to be present. But the escrow provision is, in any event, applicable only when "during the course of a lawful investigation involving *possible violations of the Federal securities laws*" it appears to the SEC that "extraordinary payments" are to be made. 15 U.S.C. § 78u-3(c)(3)(A)(i) (emphasis added). Thus, by defining "extraordinary" to mean little if anything more than that circum-

stances exist that might give cause to the SEC to initiate a lawful investigation, "extraordinary" serves no independent modifying purpose. Each payment made in the midst of circumstances likely to lead to an SEC investigation becomes made under "extraordinary circumstances," therefore an "extraordinary payment." Hence, the majority's interpretation violates the " 'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *TRW Inc.* v. *Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan* v. *Walker*, 533 U.S. 167, 174 (2001)).

Congress could have written the statute differently. The SEC might have been able to promulgate regulations so interpreting the statute. Congress didn't, the SEC hasn't, and we mustn't.[2]

---

[2] I can only assume that the majority's insouciance for these canons of statutory construction stems from its desire to give effect to what it perceives as Congressional intent. Setting aside the principle that Congress' words are the best evidence of its intent, the majority's description of Congress' intent in enacting Section 1103 does not support the majority's interpretation of "extraordinary payments." According to the majority, Congress' purpose in enacting Section 1103 was to prevent "persons, companies, and pensions plans" from being "left holding an empty bag" while, by contrast, corporate insiders are well compensated. Maj. Op. at 3398 "By the time the authorities have been alerted to the fraud," explains the majority, "it's too late [because] the assets of the company have already disappeared . . . . In the meanwhile, the disappearance of such funds impoverishes and damages the issuer itself . . . ." *Id.* at 3398. Likewise, the majority quotes Representative Sensenbrenner's explanation that Section 1103 would prevent "top executives" from "pilfer[ing] the assets of the company." *Id.* at 3399 (citing 148 Cong. Rec. H4685 (daily ed. July 16, 2002)). If it was assets "disappear[ing]" and being "pilfer[ed]" while people and pension plans were left holding an "empty bag" and issuers were "impoverishe[d]" that so concerned Congress, wouldn't the *size* of the payment rather than the circumstances surrounding the payment have been of utmost importance? Tellingly, although he did not limit "extraordinary payments" to "huge bonuses," Representative Sensenbrenner identified no other example of an "extraordinary payment[ ]."

B.

*Second*, even had the majority not rewritten the statute and, indeed, written the very term at issue out of the statute, its interpretation is unworkable as a practical matter. The majority first interprets "extraordinary payments" as those "that would not typically be made by a company in *its* customary course of business," Maj. Op. at 3417 (emphasis added). Thus, as the majority explains, "[t]he standard of comparison is *the company's* common or regular behavior." *Id.* (emphasis added). This alone raises a significant practical concern. Presumably, terminating the CEO's and CFO's employment is never done "by a company in *its* customary course of business." *Id.* (emphasis added). I think we can all agree that these events do not occur, for any given business, each Monday morning as the doors open for business. Does this mean, then, that any payment to a departing CEO, CFO or, for that matter, any officer or director may be subject to escrow? As mentioned before, even if the payment is not a golden parachute, but a mere gold watch (or even a gold-plated watch)? Can this really be what Congress meant by "extraordinary"? And if not, upon what articulable principle ingrained in the standard adopted by the majority could we arrive at a contrary conclusion?[3]

---

[3]The majority cites three cases for the proposition that this court has previously relied on evidence of a company's own past practices to determine "extraordinary expenses." Maj. Op. at 3417 n.2. In the first, the court held that a brokerage firm's commissions were excessive because "[n]o *reasonable* broker could think it could fairly charge commissions so high" and rejected the brokerage firm's asserted defense that it "provided *unique* and *special* services and [thus] incurred [relatively] high expenses." *Atlanta-One, Inc.* v. *SEC*, 100 F.3d 105, 107-08 (9th Cir. 1996) (emphasis added). In other words, the court compared the brokerage firm's commissions and expenses not to its prior practice, but to what the "reasonable" broker might charge and to what services were typically offered in the industry. That is what should happen here. In the remaining two cases, the governing statute or rule of law called for a comparison between the expense claimed extraordinary and the company's past practice. *In re*

This practical concern is made worse by the majority's concession that we must do more than compare what the subject company is doing now merely with what it has done in the past. From a company-specific test, the majority daintily dips its toe in Lake Eversharp:[4] "Evidence of the company's deviation from an 'industry standard' — or the practice of similarly situated businesses — also might reveal whether a payment is extraordinary." *Id*. at 3418. Well, which one is it? What the subject company has done in the past or what other companies have done? That is, is the test internal to the subject company or external to practices of the industry in which the company competes? What if under the internal test the payment is not extraordinary, but under the external test it is? Or vice-versa? Does the internal trump the external, or is it the other way around? Or, must the payment be extraordinary under both tests? Are we going to say nothing more than that the matter will be dealt with on a "case-by-case" basis, that favorite ploy to avoid a statement of principle?

The majority takes refuge in its assertion that "the statute does not compel any specific method of making the determination but allows for the consideration of a variety of factors, as the situation may warrant," *id*., and in its mandate that "the determination of whether a payment is extraordinary will be a fact-based and flexible inquiry." *Id*. at 3418. Standards that call for an evaluation of the totality of the circumstances are, of course, well known to the law, but they are workable only when those circumstances are compared against a known,

---

*United States Trustee*, 32 F.3d 1370, 1374 (9th Cir. 1994) (bankruptcy trustees seeking reimbursement of expenses); *Frito-Lay, Inc.* v. *Local Union No. 137, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 623 F.2d 1354, 1365 n.11 (9th Cir. 1980) (company suing for damages resulting from an unlawful strike). Of course, Gemstar had no such past practice; the cited cases are inapposite.

[4]The Eversharp Company used to advertise its wares: "Compare! Comparison proves!".

fixed standard. Here, by contrast, the majority proffers two standards that, depending on the facts of the case, may very well conflict.

### III.

Because as the statute is written "extraordinary" modifies "payments" rather than the circumstances under which those payments were made, and because the majority's standard principally requiring a comparison to the past practice of the company at issue is unworkable, I must interpret "extraordinary payments" to mean payments not usual or ordinary relative to those made by other comparable companies, under circumstances which have not resulted in an investigation by securities agencies, but which are otherwise comparable. Factors to be considered in identifying comparable companies may include their size (measured in terms of annual revenues, annual net profit, market capitalization, some other appropriate measure, or a combination of these considerations)[5] and the industry or market in which they do business.[6] Relevant comparable circumstances may include the position of those

---

[5]Such financial measures of the revenue size of the company that made the payments at issue may be artificially inflated as a result of the securities violations in which it is alleged to have engaged. Appropriate adjustments should and can be made to compensate for this.

[6]No two companies are identical, but adjustments can be made to compensate for any material peculiarities of a given company. Comparisons of this sort are daily made, for example, in equalization of property tax assessments in the real property field, where the value of a subject property is determined by the value of comparable properties as measured by such factors as the square footage, location, size of buildings and probable income. After determination of comparability, adjustments are made to compensate for peculiarities individual to the subject property. Thus, for example, if the subject property has a *lis pendens* or an unrecorded easement claimed against it, the value will likely be adjusted downwards. A similar method is used in condemnation actions. Likewise, in the field of traded securities, the market adjusts stock prices for companies with comparable earnings, but with, for example, dissimilar litigation or investigational backgrounds.

whose employment is being terminated, the length of their tenure, and the reason their employment was terminated. However, I reiterate that the comparison should *not* be to payments made by other companies that were engaged in conduct which ultimately resulted in investigation by securities agencies.[7]

Nor is this an undertaking to which federal courts are unaccustomed or for which they are ill-equipped. Legislation which uses relative adjectives to proscribe activities is hardly unknown to the law. Statutes and law commonly prohibit "excessive" verdicts and sanction "unreasonable" behavior. *E.g.*, *State Farm Mutual Automobile Insurance Co.* v. *Campbell*, 538 U.S. 408, 416 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."); Cal. Civ. Proc. Code § 657 (permitting modification or vacatur of a judgment where the award of damages is "[e]xcessive or inadequate"); Restatement (Second) of Torts § 282 (defining "negligence" as "conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm"). It is not beyond the judiciary's capacity to interpret and apply statutes which prohibit "excessive" or "unreasonable" amounts. Indeed, trial and appellate courts are called upon to do so every day.[8] And, as is of particular

---

[7]The majority, then, misstates my position when it states:

> The dissent suggests that to establish what is "extraordinary," the government must offer evidence of what constitutes "usual or ordinary payments to a CEO and a CFO under [comparable] circumstances," i.e., payments contemplated under threat of delisting, in a fight with its independent auditor; and during an investigation for having misstated revenues, cooked the books, defrauded investors, employees and the market, and possibly committed a basket full of crimes.

Maj. Op. at 3420.

[8]For instance, courts are often called upon to determine whether awards of attorney's fees are "reasonable." *See Pennsylvania* v. *Delaware Valley*

relevance here, courts are even asked whether some remuneration constitutes "extraordinary payment." An example is the line of cases which determines whether payments made by a corporation to an employee are deductible from gross income as "ordinary and necessary" business expenses or, rather, are "extraordinary payments" disallowed as a deduction. *See*, *e.g.*, *LabelGraphics, Inc.* v. *IRS*, 221 F.3d 1091, 1095 (9th Cir. 2000) (explaining that a corporation may deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" and noting as one of the factors relevant in making this determination "a comparison of the employee's salary with those paid by similar companies for similar services") (citing *Elliotts, Inc.* v. *IRS*, 716 F.2d 1241 (9th Cir. 1983)).

Whether the adjective is "excessive," "unreasonable" or "extraordinary," the cases in which those terms appear use similar processes of judgment. The trier-of-fact determines first what constitutes "adequate compensation," "reasonable

---

*Citizens' Council for Clean Air*, 478 U.S. 546, 562 (1986) ("There are over 100 separate statutes providing for the award of attorney's fees; and although these provisions cover a wide variety of contexts and causes of action, the benchmark for the awards under nearly all of these statutes is that the attorney's fee must be 'reasonable.' "). " 'The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate,' " *id*. at 564, and it is "[t]he fee applicant [that] has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Jordan* v. *Multnomah County*, 815 F.2d 1258, 1263 (9th Cir. 1987). Likewise, courts daily determine what are "extraordinary" fees in probate courts across the country. But, unlike the district court here, those probate courts have elaborate statutes, rules of procedure and case authority to guide them in determining what services by estate representatives are "ordinary" (and covered by the statutory fees) and what expenses are "extraordinary," conferring entitlement to added fees. *See*, *e.g.*, Cal. Prob. Code §§ 10801, 10811; Cal. Court R. 7.702; *In re Fulcher's Estate*, 234 Cal. App. 2d 710, 718 (Ct. App. 1965).

care," or "customary or ordinary payments." Such determinations require evidence which consists of similar factual situations which can be compared to the case at hand. If the case at hand falls outside the bounds permitted in the comparison cases, that result is deemed "excessive," "unreasonable," or "extraordinary."

### A.

Here, the SEC limited its proof in its Section 1103 application to an investigating attorney's affidavit. The affidavit — and consequently the record — is completely silent regarding what constituted usual or ordinary payments upon termination of a CEO and Chairman of the Board (Yuen) or COO and CFO (Leung) of companies with comparable financial statements and operating results. Undoubtedly, their payments were large — extraordinary, even, relative to what federal judges or, for that matter, most anyone is paid.[9] Such payments may be called "golden parachutes" or "golden handshakes" in the press, but purple prose is not enough to prove a statutory requirement in court. For enforcement of the securities laws of the United States, *evidence* of what is usual or ordinary for comparable companies under circumstances which have not resulted in an investigation by securities agencies but which are otherwise comparable, is necessary to dis-

---

[9]But not quite "anyone." For example, the *average* value of severance packages awarded in fiscal year 2000 to CEOs of companies in the S&P 500, conservatively calculated, is more than $11.4 million. *See* Paul Hodgson, *Golden Parachutes and Cushion Landings: Termination Payments and Policy in the S&P 500*, at 18-21 (2003). Of course, some CEOs are awarded severance packages that are worth many multiples of the average. *E.g.*, Chad Terhune *et al.*, "Coke Tradition: CEOs Go Better With a Fat Send-Off," *Wall Street Journal*, June 11, 2003, at B1 (reporting M. Douglas Ivester's "exit package" upon being "ousted" as Chairman and CEO of Coca-Cola in February 2000 as $119 million); Sam Zuckerman, "The Fall and Rise of David Coulter," *San Francisco Chronicle*, May 25, 2002, at A1 (reporting David Coulter's severance package after being "unceremoniously ousted" as CEO of Bank of America and "le[aving] San Francisco with his reputation in tatters" as "nearly $100 million").

tinguish "extraordinary payments" and to order their escrow pursuant to Section 1103. Such evidence was not adduced in the district court; that absence requires the reversal of the judgment of the district court.[10]

### B.

The remaining factors on which the majority relies are either irrelevant or fail to evidence that the payments here were extraordinary. Thus, because I interpret "extraordinary" to modify "payments" rather than the circumstances under which those payments were made, that " 'the termination agreements were executed as part of the process of removing both Leung and Yuen from their positions as Gemstar Officers,' " that "the bonuses appear to be fruit of the alleged fraudulent financial results," that the "executives [were] resigning under fire from key management positions," and that the payments were made "in the shadow of misstated revenues, misleading public statements, securities fraud investigations, plunging stock prices, . . . public relations debacles, . . . [and] Yuen's and Leung's inability to certify Gemstar's books as accurate," Maj. Op. at 3419-20, is irrelevant. Likewise, because I believe that the relevant comparison is to other companies rather than to Gemstar's past practices, that the "negotiated Termination Agreement payments here are five and six times greater than Yuen's and Leung's base salary," that "the component amounts that make up the lump sum payments are different than the amounts due under their employment agreements," that "the termination fees are different from what they may have been entitled to under existing agreements," and that "the vacation pay item did not exist under their contracts," *id.* at 3419-20, also is, absent evidence of other companies' practices, irrelevant.

---

[10]Nor, frankly, would requiring such evidence be particularly onerous for the SEC. Evidence in the form of expert testimony or an affidavit or declaration comparing the payments under scrutiny with other executives' compensation packages is readily ascertainable from public filings. *See supra* note 8.

This, then, leaves only three factors on which the majority relies that at best serve as evidence that either Gemstar or Yuen and Leung themselves believed the payments to be extraordinary and, thus, as circumstantial evidence that they were extraordinary: (1) that " '[t]he payments were negotiated over a five month period and involved the participation of the Gemstar Board, a Special Committee, and outside consultants,' " and " '[t]he Board, the Special Committee, and the Intervenors Yuen and Leung were each represented by separate sets of counsel' "; (2) that "Yuen would not discuss these matters with the Commission, choosing instead to assert his Fifth Amendment privilege"; and (3) that Gemstar reported the terms of the termination agreements in a Form 8-K filing. *Id.* at 3419-20.

As for the negotiation of the termination agreements, nothing in the record suggests that this extended negotiation constitutes a deviation from the norm for corporate decision-making of this type under circumstances not resulting in an investigation by securities agencies, but which are otherwise comparable. Indeed, for all the persons involved in the negotiations, not one presented evidence before the district court that the period or mechanics of the negotiations were out of the ordinary. While common experience of the district court might help to determine what is the usual way to negotiate the termination of a lawyer at a law firm or a staff member of the court, common experiences of this kind do not aid judgment with respect to the termination of Yuen's and Leung's employment with Gemstar.

Further, even on their own terms, these negotiations are not particularly suspicious given the context. To begin, as the declaration of Yuen's and Leung's counsel shows, Gemstar-TV Guide was the product of a merger between, on the one hand, an off-shore company founded by Yuen and Leung and, on the other, TV Guide, a subsidiary of News Corporation, itself a large telecommunications company. Yuen and Leung presented uncontradicted evidence that their revenue-

producing strategies differed, if not clashed, with those of News Corporation. Whereas Yuen and Leung were interested primarily in raising revenue attributable to the corporation's sales, the minority owners, Gemstar's current management, were in part interested in publicizing one of their sister corporations through Gemstar's operations, without paying Gemstar any advertising revenue. Such a strategy would increase revenues for the sister corporation, but not for Gemstar. As owners and officers in Gemstar, Yuen and Leung would not share in the profits of the sister corporation.

In addition, in the event that Yuen or Leung were terminated "without cause," as they were, lengthy and complex employment agreements governed their termination payments. Yuen and Leung had three different components for calculation of their Annual Incentive Bonuses. Complex enough when based on the company's past performance, computations also had to be done for future payments, with the consequent and predictable squabbling over methods for projecting future financial performance. Thus, in view of Gemstar's revenue structure, the conflicting strategies, and the complex schemes for computation of termination payments, it is not the least bit surprising that the negotiations pertaining to Yuen's and Leung's departures would be lengthy and that all interested parties would be represented by counsel.

As for Yuen asserting his Fifth Amendment privilege, it is hard to imagine what inference this raises given the context. Yuen had been the CEO of a company that the SEC was investigating for securities violations. It is more likely than not that his invocation says a great deal more about those alleged securities violations than it does about whether his payment was extraordinary.

Last, a Form 8-K filing is required from an "issuer of securities when substantial events occur . . . ." *Scherk* v. *Alberto-Culver Co.*, 417 U.S. 506, 528 n.6 (1974). In this era of heightened corporate vigilance, it is not surprising that Gem-

star management should choose to make this report upon the termination of the founders of the company, who were being paid millions of dollars on departure in an amount approximating 15 percent of the previous year's revenues. But a discretionary corporate disclosure is not an admission that the company has paid an "extraordinary" amount. In any event, there was also no evidence of whether other "issuers" had made similar reports for similar sums paid to similarly departing upper management. A "substantial event" may or may not coincide with an "extraordinary payment." Only evidence of comparable events and circumstances can tell us.

## IV.

The majority's interpretation of "extraordinary payments" may very well best empower the SEC to remedy the outrageous corporate misconduct that gave birth to the Sarbanes-Oxley Act. However, we are not a junior varsity legislature, *see Mistretta* v. *United States*, 488 U.S. 361, 427 (1989) (Scalia, J., dissenting), and must take Congress at its word, *see Bifulco*, 447 U.S. at 401, ever cognizant that Congress and the Judiciary alike are in the business of using language precisely. Where Congress fails to do so, it should not look to the Judiciary for a remedy — nor need it.

Section 1103 empowers the SEC to escrow "extraordinary payments," not payments made under extraordinary circumstances, particularly where "extraordinary circumstances" means little if anything more than that the company is under investigation for securities violations. Further, if it is to be a workable standard, the relevant comparison must be not to the company at issue, but to other comparable companies, under circumstances which have not resulted in an investigation by securities agencies, but which are otherwise comparable. Because the SEC failed to adduce any such relevant evidence, I would vacate the district court's order and permit the SEC the opportunity to do so. Accordingly, I respectfully dissent.